AG FUR INDUSTRIELLE ELEKTRONIK AGIE, Plaintiff,

v.

SODICK COMPANY, LTD., Sodick, Inc., and KGK International Corp., Defendants.

SODICK COMPANY, LTD., Sodick, Inc., and KGK International Corp., Counterplaintiffs,

v.

AG FUR INDUSTRIELLE ELEKTRONIK AGIE, Counterdefendant.

No. 87 C 8974.

United States District Court, N.D. Illinois, E.D.

Oct. 5, 1990.

Mark Crane, James D. Ossyra of Hopkins & Sutter, James T. Williams, James P. Naughton of Neuman, Williams, Anderson & Olson, Chicago, Ill., Charles M. Shaffer, Jr., Bruce W. Baber of King & Spalding, Atlanta, Ga., for plaintiff.

P. Jay Wilker, Neil E. McDonell, Ann G. Kayman of Marks, Murase & White, New York City, Paul Devinsky, James G. Gatto of Marks, Murase & White, Washington, D.C., Alan L. Unikel, Timothy L. Swabb of Seyfarth, Shaw, Fairweather & Geraldson, Chicage, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Each side in this hard-fought patent suit[1] seeks summary disposition of part of the other side's prayer for relief. Defendants–Counterplaintiffs Sodick Company, Ltd., Sodick, Inc. and KGK International Corp. (collectively "Sodick") have moved alternatively (1) for partial summary judgment under Fed.R.Civ.P. ("Rule") 56 upholding Sodick's Counterclaim Count II or (2) for an order narrowing the issues under Rule 16. Plaintiff–Counterdefendant AG Fur Industrielle Elektronik AGIE ("Agie") has moved for dismissal of Sodick's Counterclaim Count I under Rule 12(b)(6).[2] For the reasons stated in this memorandum opinion and order, Sodick's motion for par-

---

1. As the text of this opinion shortly reflects, the battle has now moved into the antitrust arena as well.

2. Agie has also moved to dismiss Sodick's most recent antitrust claim as set out in its Counterclaim Count III. Because that motion is just now nearing completion of its briefing schedule, this Court thought it inappropriate to defer ruling on the current fully-briefed motions until that one became ripe for consideration and decision.

tial summary judgment is granted and Agie's motion to dismiss is denied.[3]

*Facts and Procedural History*

This case involves patent rights to specific designs of wire electrical discharge machine tools ("wire EDMs") and even more specifically to computer numerically controlled versions of those machines ("CNC wire EDMs"). As Sodick describes it, a CNC wire EDM works like a sophisticated jigsaw. It performs delicate cutting jobs on metal or other electrically conductive material such as ceramics. Cutting is performed by a wire electrode that passes through the material being cut and is stretched between two guides, one on either side of a workpiece. Unlike a jigsaw, however, cutting is not accomplished by physical contact between the wire and the material being cut, but instead by electroerosion: Electrical discharges emitted from the wire electrode pass through a dielectric liquid such as deionized water (the "fluid medium") and erode the conductive material being cut. As the electric sparks from the wire electrode shave off bits of the material being cut, the flushing fluid removes the cuttings from the cutting area.

Both Agie and Sodick make wire EDM machines. Agie has claimed that Sodick's designs infringe on an Agie patent, while Sodick has counterclaimed that Agie's patent was procured by fraud. At issue in the current motions is:

1. whether Sodick's newest type of wire guide and fluid medium flushing assemblies (the "New Assemblies")—the structures that determine how the fluid medium is discharged in relation to the wire electrode—infringe one or more of Claims 1, 7, 9, 20 and 22 (the "Five Claims") of Agie's earlier-procured United States Patent No. 3,928,163 (the " '163 patent"),[4] and

2. whether Sodick's Count I states a cause of action for antitrust violations.

Only the first of those motions involves a factual inquiry as to which a determination of materiality must be made.[5] Many of the necessary factual findings were dealt with in this Court's May 5, 1990 order (the "Order")[6] preliminarily enjoining Agie from further pursuing before the ITC any enforcement proceedings related to Sodick wire EDMs equipped with the New Assemblies, pending this Court's ruling on Sodick's motion for partial summary judgment on Count II. Although Sodick later withdrew that motion in its then-pending form, it has since refiled basically the same motion. That current motion seeks a summary declaratory judgment finding that the New Assemblies simply implement prior art (prior to the '163 patent, that is), so that the Agie patent cannot block the New Assemblies.

---

3. Because both motions deal with Sodick's Counterclaim, the balance of this opinion will simply refer to "Count I" or "Count II" without the prefatory term "Counterclaim."

4. This action first arose when Agie claimed that Sodick's wire EDM, which at the time used wire guide and fluid flushing assemblies (the "Prior Assemblies") that resembled Agie's device much more closely than any prior art, infringed the '163 patent and Agie's United States Patent Nos. 3,892,829 and 3,987,270. In 1989 Agie also asked the United States International Trade Commission ("ITC") to exclude Sodick's wire EDMs from the United States on the ground that they infringed the '163 patent, so that their importation constituted unfair competition. After ITC's March 8, 1990 ruling that the Prior Assemblies indeed infringe the Five Claims, Sodick began fitting its wire EDMs with the New Assemblies.

5. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548,

2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Agie (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Patent cases apply the same standard (*Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77 (Fed.Cir.1989), citing among other cases the Federal Circuit's affirmance of a decision by this Court granting summary judgment to a defendant in a patent infringement suit, *Townsend Engineering Co. v. HiTec Co.,* 829 F.2d 1086, 1089 (Fed.Cir.1987)).

6. Because the Order was issued in the preliminary injunctive mode, its Findings of Fact ("Findings") would not necessarily represent ultimate findings on the merits of the litigation. In this instance, though, the parties have proffered the same evidentiary materials for current consideration. Consequently this opinion reflects the same facts as were set out in the Findings, and those material facts are really undisputed so as to permit the entry of summary judgment in Sodick's favor.

*1. Prior Art.* On August 15, 1972 Hans Rudolf Lehmann procured Swiss Patent No. 526365 (the "Lehmann patent") for a wire EDM incorporating the wire guide and flushing fluid assembly shown in Exhibit 1. As that exhibit discloses, and as Order at 2–3 found, the Lehmann patent disclosed the following characteristics:

(a) Flushing liquid is discharged through the outlets of several discrete channels 23 formed in the upper die 12 and several discrete channels 22 formed in the lower die 11. Lehmann states in part that "each die has several channels 22 and 23, respectively, which provide a link between the external face and the internal face of the die." None of the channels 22 and 23 is coaxial with the axis of the wire electrode 7.

(b) Flushing liquid is discharged from the outlets of channels 22 and 23 at a substantial angle to the axis of the wire electrode 7.

(c) Flushing liquid, as it leaves the outlets of channels 22 and 23, is not discharged parallel to the axis of the wire electrode 7.

(d) Flushing liquid, as it leaves the outlets of channels 22 and 23, is not discharged alongside of the wire electrode.

(e) Flushing liquid, as it leaves the outlets of channels 22 and 23, is not discharged in contact with the wire electrode.

*2. Agie's '163 Patent.* On April 23, 1974 Agie applied for its own patent (issued December 23, 1975 as the '163 patent) on the wire EDM assembly shown in Exhibit 2. As Exhibit 2 illustrates, that patent differed from the Lehmann patent in that the '163 patent flushing assembly includes a single duct that surrounds the wire electrode coaxially and that discharges flushing fluid in a single stream in contact with, alongside of and parallel to the wire electrode. Claims 1, 7 and 9[7] of the '163 patent describe Agie's machine as a wire electroerosion machine tool with a wire guide and fluid delivery means including:

a portion defining an outlet for discharging a fluid medium alongside of said electrode in contact with the outer surface thereof and parallel to the axis thereof towards a working area of said electrode, and a portion providing duct means for leading said fluid medium from a supply conduit to said outlet in such a way as to cause said fluid medium to be discharged through said outlet as aforesaid when supplied from said supply conduit.

Agie did not cite the Lehmann patent as prior art during the course of its original prosecution of the '163 patent. At the request of one of Agie's competitors, however, the '163 patent was reexamined by the United States Patent and Trademark Office ("PTO") as Reexamination Request No. 90/000,629 filed September 17, 1984 (the "Reexamination"), and on November 5, 1985 Reexamination Certificate No. B1 3,928,163 was issued. In the course of the Reexamination Agie added several new claims, including Claims 20 and 22. Each of those claims included a limitation virtually identical to that quoted above from Claim 1.[8] As the following discussion reflects, much of Sodick's legal position rests on what did and what did not take place during the reexamination proceedings.

Part of the reexamination involved comparison of the '163 patent's claims to prior art including the Lehmann patent. On February 20, 1985 Agie filed a Statement and Amendment of Patent Owner seeking to distinguish the '163 patent from Lehmann and other prior art. That statement represented that no prior art at issue in the Reexamination taught "any EDM apparatus where the flushing liquid is discharged along the surface of a wire electrode and parallel to the axis of that electrode," and specifically that "[t]he Lehmann reference is equally deficient in any teaching of flushing fluid parallel to the axis of the electrode."[9]

---

**7.** Because Claims 7 and 9 of the '163 patent depend upon Claim 1, they include all the limitations of Claim 1.

**8.** That limitation parrots the quotation from Claim 1 except for the addition of the words "in a jet":

... a portion defining an outlet for discharging a fluid medium *in a jet* alongside of said electrode....

**9.** In contrast to Lehmann, the description in the '163 patent itself (column 5, lines 19–32, emphasis added) says this about the purpose of the coaxial design of the duct:

On May 9, 1985 the PTO issued an Office Action that rejected Claims 1, 7, 8 and 16 of the '163 patent as being anticipated by or obvious in view of Lehmann. That Office Action stated:

It is considered that the fluid discharging from the [Lehmann] reference means delivering fluid to the working area inherently discharges parallel to the direction of travel of the wire. Note that claim 16 merely requires movement of fluid along the axis of the wire. Surely, the [Lehmann] reference fluid does that.

In addition, the PTO rejected Claim 9 as anticipated by or obvious in view of other prior art.

On July 9, 1985 Agie filed with the PTO a response to that Office Action, asserting numerous distinctions between the '163 and Lehmann patents. That response said in part:

[I]t must be kept firmly in mind that a principal purpose [of Agie's design] is to provide a flushing fluid nozzle and wire guide which results in a flow of flushing fluid which is both parallel to the wire and in contact with the wire as the fluid leaves the nozzle outlet.

Agie concluded:

Thus, each of the Lehmann and Crookall statements clearly establish that the Lehmann reference does not inherently disclose discharge of flushing fluid from the dies parallel to the wire electrode.... Lehmann in no way teaches the subject matters of claims 1 or 16.... New claims 20–24 also distinguish over Lehmann for the same reasons as discussed with respect to claims 1 and 16.

Agie also filed with its response the statement of Professor John R. Crookall ("Crookall") and the affidavit of Lehmann himself. Crookall concluded:

I do not believe that the devices shown in Lehmann will necessarily produce a discharge of dielectric fluid that is generally parallel to and surrounding the wire electrode.

The flushing liquid is delivered through the pipe 22 into a bore 26 which, with its flow-promoting configuration (tapering cross section), carries the water along the lower half of the sapphire guide so that the wire heated by the machining operation can be cooled over a greater length. For this reason, the wire is able to withstand heavier current loads with-

Lehmann's affidavit stated in pertinent part (emphasis added):

Figures 2 and 3 are not drawn to scale. For example, the written description states that the wire diameter is between 0.180 and 0.200 millimeters. The relative size of the wire is shown in Figures 2 and 3 as being much larger than that. The outside diameter for wire drawing dies in Europe in the early 1970's was commonly 25 millimeters.... The *characteristics of the flushing fluid flow* which result from any apparatus constructed in accordance with Figures 2 and 3 of my patent *will depend on the values which are chosen for various parameters of the structures shown. Such parameters include the cross-sectional areas of the channels 22 or 23, the relationship between the channel cross-sectional areas and the cross-sectional area of the wire, and the velocity of the fluid through the channels ....* For example, if the cross-sectional areas of channels 22 or 23 were approximately the same size as the wire and the velocity of the water through the channels was relatively high, the flushing fluid could be partially deflected by the wire and could appear to bounce off the wire without the creation of any substantial parallel flow.

Ultimately the PTO accepted Agie's arguments and issued its July 29, 1985 Statement of Reasons for Allowance, reading in part:

[I]t is considered that the apparatus of said references [including Lehmann] are incapable of flushing the fluid in the manner recited in the instant claims.

*3. Sodick's New Assemblies.* Sodick's wire EDMs come in two types—those with automatic wire threading ("AWT") and those without—but each includes a New Assembly (adapted for the presence or absence of the AWT option). Each kind has two wire guides and flushing assemblies—

out any danger of cracking. At the outlet end of the wire guide, the jet of water is deflected by the extension 27 in such a way that the wire is completely flushed with water. The last part of the bore 28 *ensures that the jet of water stabilizes before issuing from the flushing nozzle coaxially of the wire.*

one above the workpiece and one below. Sodick's New Assembly with AWT has an upper wire guide and flushing assembly with a nozzle portion that has six spaced ports and a lower wire guide and flushing assembly with a nozzle portion that has four spaced ports. As for the New Assembly without AWT, each of the upper and lower wire guide and flushing assemblies has the same four-port nozzle as is employed for the lower assembly of the New Assembly with AWT. Exhibit 3 shows the upper assembly for Sodick's wire EDMs with AWT, while Exhibit 4 shows the corresponding wire guide and flushing assembly for Sodick's wire EDMs without AWT. Order at 12 made this Finding:

24. In the operation of the Sodick wire EDMs equipped with the New Assemblies, with or without AWT:

(a) Flushing liquid is discharged through several (four or six, depending on the nozzle) discrete ports in a nozzle portion of a water guide.

(b) Flushing liquid is discharged from the ports in the nozzle portion of the water guide at an angle approximately 45° to the axis of the wire electrode.

(c) Flushing liquid, as it leaves the ports in the nozzle portion of the water guide, is not discharged parallel to the axis of the wire electrode.

(d) Flushing liquid, as it leaves the ports in the nozzle portion of the water guide, is not discharged alongside of the wire electrode.

(e) Flushing liquid, as it leaves the ports in the nozzle portion of the water guide, is not discharged in contact with the wire electrode.

(f) Essentially all of the flushing fluid used to flush the working zone is discharged from the ports in the nozzle portion of the water guide.

### Sodick's Motion for Summary Judgment

Sodick's summary judgment motion on Count II seeks a declaratory judgment that the New Assemblies do not infringe the Five Claims of the '163 patent. For Agie to claim literal infringement it would have to show that the New Assemblies embody every element of the '163 patent's claims (*Stewart–Warner Corp. v. City of Pontiac, Michigan,* 767 F.2d 1563, 1570 (Fed.Cir.1985)). Agie has apparently eschewed any theory of literal infringement (Agie Mem. 4–5) in favor of resting its case on the doctrine of equivalents. Under the statement of that doctrine in the Supreme Court's seminal decision—*Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)—a patent may be infringed even if not literally infringed if the accused device "performs substantially the same function in substantially the same way to obtain the same result"—an inquiry frequently termed the function-way-result test. That is the test this Court must apply.[10]

---

**10.** Agie's opening salvo in response to Sodick's motion (Agie Mem. 6–8) actually asks this Court to decline to make any determination on the merits, lest this Court's determination might be somehow inconsistent with the inevitable jury determination on other issues that are not the subject of the current motion. Agie is specifically worried that Sodick will urge on this Court a narrow construction of the Five Claims (e.g., that the relevant "outlet" for determining whether the fluid flow is in contact with and parallel to the electrode is the duct outlet inside the New Assembly nozzle structure) but will urge on the jury charged with determining the validity of Agie's patent a very broad construction (e.g., that the relevant "outlet" is where the fluid exits the nozzle structure). But Agie's concern is misplaced for two reasons:

1. Even if some or all of the issues in this case reach a jury, all the issues of claim interpretation that concern Agie are issues of law for determination by this Court (*Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956 (Fed.Cir. 1983)), and a dispute on such an issue does not preclude summary judgment where the facts from which the interpretation must be made are not in dispute (see *George v. Honda Motor Co.,* 802 F.2d 432, 434 (Fed.Cir.1986)).

2. Even if Sodick does take such "inconsistent" positions on summary judgment and at a later trial, Agie would have no cause to complain. Obviously the call for consistency between interpretations for determining validity and infringement in *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 882 (Fed.Cir.1988) does not preempt Rule 8(a)'s allowance for pleading in the alternative—and that is really all that Sodick does when it defends on the alternate grounds that either (a) the New Assemblies do not infringe

■ Although equivalency is generally a question of fact (*Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856), summary judgment will be appropriate if it turns out that there is no real dispute about equivalency because Agie is estopped from arguing nonequivalence under the doctrine of prosecution history estoppel (*Brenner v. United States*, 773 F.2d 306, 307 (Fed.Cir.1985)). According to *Townsend Engineering*, 829 F.2d at 1090, quoting *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579 (Fed.Cir.1983), prosecution history estoppel:

> limits a patentee's reliance on the doctrine of equivalents by preventing him from contending later in an infringement action that his claims should be interpreted as if limitations added by amendment were not present.[11]

■ In addition to limiting the patentee's reliance on the doctrine of equivalents where the patentee has formally added limiting amendments to the patent's claims, *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983) (quoted in *Townsend, id.*) says that prosecution history estoppel applies:

> to claim amendments to overcome rejections based on prior art, and to arguments submitted to obtain the patent.

Because Agie counters Sodick's current motion by raising numerous assertedly genuine issues of fact for determination at trial, the question boils down to whether Agie is estopped from raising any of those issues by reason of limiting interpretations that Agie put on the '163 patent in its attempt to convince the PTO Examiner that the '163 patent was distinct from prior art.

Both parties frame the inquiry in the same way. It is, as Agie Mem. 16 states:

> Does the duct structure in Sodick's modified assemblies perform the same or substantially the same function as the duct structure in the embodiment described in the '163 patent specification, in the same or substantially the same way, to achieve the same or substantially the same result?

According to Agie, the relevant "function" of the duct structure in the '163 patent is that stated in the claims themselves:

> to lead the flushing fluid from a supply conduit to the outlet in such a way as to cause the fluid to be discharged alongside, in contact with and parallel to the wire, towards a working area of the wire.[12]

Throughout this case each of the parties has put great stress on its own interpretation of the word "outlet." There is no dispute that the outlet of the '163 patent's assembly coincides with the plane formed by the lowest end of the entire nozzle assembly—for in the '163 patent the flushing fluid duct and the nozzle assembly end at the same point. What is hotly disputed, however, is just what constitutes the "outlet" of the Sodick assembly.

Sodick looks to Agie's claim itself, which speaks (emphasis added) of a "duct means for leading said fluid medium *from a supply conduit to said outlet* in such a way as *to cause said fluid medium to be discharged through said outlet.*" According to Sodick the only analogous outlet on Sodick's assembly is where the duct ends inside the Sodick assembly, from which point

the '163 patent or (b) the '163 patent is invalid. Agie could not even complain of a finding for Sodick on *both* defenses, because a finding at trial that the '163 patent is invalid would of course make irrelevant any claim Agie might have that the New Assemblies were infringing.

11. [Footnote by this Court] *Townsend* affirmed in all respects this Court's decision rejecting the patent in suit in that case, including this Court's analysis of the issue of prosecution history estoppel (what used to be called "file wrapper estoppel").

12. [Footnote by this Court] According to Agie, the '163 patent's ability to perform that function

is particularly important for "finishing" or "skim" cuts—using the wire carefully to trim the edge of a workpiece that has been through a high-speed "roughing" cut, in order to finish the workpiece and obtain a desired surface quality. Whereas roughing cuts are made with the wire guide in very close proximity to the workpiece and can take advantage of the cut itself to help channel flushing fluid over the cutting area, skim cuts are made with a substantial distance between the wire guide and the workpiece, so that it is crucial to insure the flow of fluid down the wire to the working area.

the fluid is left free to spray in a jet toward the electrode. Thus Sodick argues for a construction of the claim that would give the Sodick assembly (and the Lehmann patent) multiple discrete outlets that discharge fluid neither alongside nor in contact with nor parallel to the wire, and hence would establish the New Assemblies' inability to perform the same function in the same way as is taught in the '163 patent (though the end result may be the same).

Agie, on the other hand, looks to its own statements at the Reexamination, as well as those of the PTO Examiner, to support its conclusion that the outlet is the plane that forms the lowest point on the assembly as a whole. Agie in particular notes that it specifically did not distinguish the Lehmann patent at the Reexamination by contending that Lehmann's outlets were the duct ports, even though that argument, if true and if accepted, would have been the logical response to the PTO's rejection of the '163 patent as anticipated by or obvious in light of Lehmann. Instead Agie argued and the Examiner eventually found that the Lehmann patent *did not inherently disclose* how fluid would be discharged—an argument that would have been frivolous if the inquiry was merely into how fluid was discharged from the duct ports.

Much of that dispute, however, turns out to be beside the point. Even if Agie were to have its way so that the Sodick "outlet" were to be placed at the bottom exit of the nozzle assembly as a whole, the fluid flowing past that point still cannot be "alongside, in contact with and parallel to" the wire. As Exhibit 5 shows, if a line is drawn down the center of each fluid duct and beyond, the lines converge at a point *below* the plane forming the nozzle opening—a point that Sodick R.Mem. 14 places at 1.9 millimeters below the plane that Agie says forms the outlet. Of course an understanding of the elementary physical principle that a fluid under pressure will diverge from the center as it exits from a constraining pathway or duct would suggest that

the precise point chosen by Sodick—1.9 millimeters below the nozzle—is not the relevant point either. If the inquiry is one of determining the point, if any, at which the bulk of the fluid is generally travelling parallel to the wire in a column, that point will obviously be even farther down the wire (and hence farther below the plane forming the nozzle opening) than Sodick's measurement would suggest. But what is certain is that no matter precisely where that point is, it must be *below* the opening of the nozzle assembly. Thus even at the point where the fluid leaves the entire assembly it is not on the whole travelling alongside of, in contact with and parallel to the electrode—a point that Agie itself seems to recognize when it says (Agie Mem. 18, emphasis added):

> Both [New Assembly] discharges are alongside, in contact with and parallel to the wire electrode, or at least substantially so, at the outlet of the assembly, *or slightly below it.*

As Agie would have it, it does not matter whether the duct structure creates a flow of fluid that is parallel to the wire as it leaves the Agie-defined "outlet" or rather achieves such a parallel flow some distance downstream of the outlet. Either way, Agie says, the device functions as a substantial equivalent to a device, like that disclosed by the '163 patent, that provides that kind of flow as the fluid leaves the nozzle outlet.

Under Agie's current arguments, any EDM that discharges flushing fluid in such a way that the electrode is surrounded with fluid that travels down the wire toward the workpiece—a process Agie calls "forced flushing"—might infringe the '163 patent. In particular it is Agie's contention that even the New Assemblies, whose basic design all agree was inspired by the Lehmann patent, infringe the '163 patent to the extent that they can perform forced flushing.[13] But in so arguing Agie takes a

13. That might perhaps be true if the '163 patent had invented forced flushing to begin with, but it did not. Despite the contention to the contrary in Agie Mem. 28–29, the Lehmann patent clearly contemplated some form of forced flushing. In that regard, the English translation of

the Swiss Lehmann patent description shows that Lehmann was also concerned both with cutting modes in which the dies were in close proximity to the workpiece and cutting modes in which they were farther removed:

position squarely at odds with its own statements to the PTO—the very statements that convinced the Examiner to overturn the initial rejection of the '163 patent.

It is true that much of what Agie said to the PTO during the Reexamination could be read to suggest that Agie's main concern was that parallel flow be assured at some point along the wire before the fluid would have reached the working area. But Agie also unmistakably took the position at that time that the best way to do that—indeed the only way to assure that such flow would result under all operating conditions—was to make certain that the flow had stabilized alongside, in contact with and parallel to the wire *before the fluid left the constraints of the nozzle.* Agie's Response (Sodick Mem.Ex. 19 at 5) states it most clearly:

> In considering the merits of the Ullmann invention, it must be kept firmly in mind that a principal purpose is to provide a flushing fluid nozzle and wire guide which results in a flow of flushing fluid which is both parallel to the wire and in contact with the wire *as the fluid leaves the nozzle outlet.* By using the flushing

system of the EDM machine itself to create a flow of flushing fluid parallel to the wire, rather than leaving the flow characteristics of the fluid in the work gap up to the geometry of the workpiece, greater uniformity and speed of cutting can be achieved *under all conditions,* as discussed above.

As the previous paragraph of Agie's Response, *id.* had stressed:

> By having the discharge of the dielectric fluid along the wire electrode as described in the ['163 patent], the EDM process also enjoys more *stable flushing conditions in the work gap over changing cutting conditions* and contours and hence a more stable level of conductivity of the fluid in the work gap.

In addition, Agie repeatedly emphasized two other advantages of the '163 patent's single parallel duct design: (1) the minimization of vibration in the wire by avoiding the effect of lateral forces acting on the wire and (2) the added cooling effect of fluid passing over the entire electrode even while in the assembly and guides. But an analysis of those claimed advantages effec-

> As shown in Figure 2 [of Exhibit 1], dies 11 and 12 can be used to bring dielectric fluid into the immediate proximity of the machining area. To this effect, each die is mounted in a support having supply line 14 and 15, respectively, which provide a link between the external face and the internal face of the die. In this way, the dielectric liquid is brought around wire 7 in the immediate proximity of the machining area.
>
> Figure 3 is a partial view of a varying embodiment of the installation described in Figure 1 wherein wire 7 is delivered from top to bottom through dies 11 and 12 each provided with an insulating air seal 24 coming into contact with part 2 to be machined and comprising an annular chamber 29 between each of the dies and the part 2....
>
> Through an appropriate adjustment of the input and discharge of the dielectric fluid in these two annular chambers 29, it is possible to circulate a sufficient quantity of dielectric fluid in notch 8 of plate 2 and, in particular, in the frontal part of this notch, wherein the electro-erosion spark discharge occurs, so that immersion of the machining area of part 2 into a container filled with dielectric liquid can be dispensed with.
>
> \* \* \* \* \* \*
>
> Figure 4 shows schematically, as a longitudinal and crosswise section, a varying embodiment in which the input die 26 has longitudi-

> nal grooves in the wall of its conduit. This varying embodiment is particularly valuable in the case in which the machining area is not immersed in a container of dielectric liquid. The longitudinal grooves 27 produced by these flutes on the periphery of wire 7, when it is drawn out, facilitate, indeed, the circulation of the dielectric fluid in the machining area of part 2 as well as the discharge of machining residues.
>
> Figure 5 shows a varying embodiment of die 26 wherein the latter is driven into rotation around its axis so that helicoidal grooves 28 are produced on wire 7.

All those "varying embodiments" of the Lehmann patent are obviously intended to insure that the flushing fluid circulates around the wire rather than dissipating in spray away from the wire. Its claim to be able to operate without requiring the total immersion of the workpiece in fluid (as most previous EDMs apparently operated) necessarily implies an ability to direct fluid at least some distance along the wire toward the workpiece. It is clear that the idea that such a result was desirable did not originate with Agie, and the Lehmann design certainly portrays a very different way to accomplish that result than does Agie's later '163 patent.

tively takes the New Assemblies (which echo Lehmann) out from under Agie's claim of infringement of the '163 patent.

As for the first factor, Agie repeatedly contrasted the '163 patent's design with the Lehmann design's multiple jets directed at a 45° angle to the electrode (Agie Mem. Ex.6 at 5, emphasis added):

> The ['163 patent] teaches a combination electrode guide and dielectric fluid discharge assembly which provides a discharge of dielectric fluid generally parallel to, and in contact with the surface of, the wire electrode, and which also minimizes the length of unsupported electrode between the upper and lower wire electrode guides by positioning the wire electrode guide near to the discharge point of the dielectric fluid. *This construction reduces the vibration of the wire electrode through the work gap, which vibration may be caused by lateral forces acting on the wire (as from dielectric fluid being directed toward the electrode from the side) and which is aggravated by having a long span of unsupported wire electrode.*

And again (*id.* at 12, emphasis added):

> Finally, it must be noted that the apparatus of the Lehmann reference *would tend to cause vibration of the wire electrode, contrary to the goal and achievement of the ['163 patent]* as discussed above with respect to Polotsky. The fluid flows from channels 22 and 23 in Lehmann are directed toward the electrode at an angle and thus have lateral force components that are exerted upon the wire (Crookall, ¶ 9). As Mr. Lehmann himself states, depending on the values of parameters for the construction of the Lehmann apparatus, the flushing fluid can deflect and bounce off the wire electrode and vibrate the electrode (Lehmann, ¶ 6).

In addition, the Crookall affidavit's first substantive paragraph about the '163 patent said (Sodick Mem.Ex. 20 at 2–3, emphasis added):

> 4. The invention described in the ['163] patent is primarily directed to elec-

tro-discharge machining (EDM) using a filamentary wire electrode. This invention addresses the problem of maintaining stable and effective operating conditions in the area of the work gap between the wire electrode and the workpiece. The process identifiable to me in the patent is a precision industrial process. The details given in the patent are consistent with the knowledgeable execution of a practicable, commercial EDM machine. *In particular, the ['163 patent] invention serves to minimize undesirable vibrations of the wire electrode in the work gap and maintain a stable level of conductivity of the dielectric fluid used to flush the work gap. The former goal is attained in the ['163 patent] primarily through the positioning of the electrode guides and the controlled discharge of dielectric fluid to the work area.*

Crookall ¶ 5 continues (*id.* at 3):

> This construction reduces the vibration of the wire electrode through the work gap, which vibration may be caused by lateral forces acting on the wire (as from dielectric fluid being directed toward the electrode from the side) and which is aggravated by having a long span of unsupported wire electrode.

Those sidelong references to the Lehmann design were made specific in the discussion of the Lehmann reference (*id.* at 5–6):

> The fluid is clearly introduced to the electrode at an angle from a number of conduits (22, 23 in figures 2 and 3). The confluence of the separate jets impinging upon the electrode would convey a substantial energy component which is not parallel to the wire electrode axis and would be likely to introduce turbulence and vibration of the wire.

To the extent that those facts served to distinguish the Lehmann device, they obviously also distinguish the New Assemblies modelled after Lehmann—or, conversely, the New Assemblies distinguish themselves from the device taught in the '163 patent.[14]

---

14. Agie continues to blur—or rather to disregard entirely—those distinctions that it urged

As for the other claimed advantage of the '163 patent's duct structure being parallel to and surrounding the electrode as the electrode passes through the wire guide—that is, the fluid's cooling effect—the '163 patent itself explains (Agie Mem.Ex. 1, column 5, lines 19–27):

> The flushing fluid is delivered through the pipe 22 into a bore 26 which, with its flow-promoting configuration (tapering cross section), carries the water along the lower half of the sapphire guide so that the wire heated by the machining operation can be cooled over a greater length. For this reason, the wire is able to withstand heavier current loads without any danger of cracking.

Because the New Assemblies employ angled jets that intersect the wire below the wire guide itself as did Lehmann, the '163 patent's asserted advantage over Lehmann in cooling would be a like advantage over the New Assemblies. Again the important factor for current purposes is that the New Assemblies track Lehmann in this respect as well.

Not only did *Agie* argue that the '163 patent differed from the Lehmann patent both in the way the fluid travelled down the wire after leaving the nozzle and also in the way the fluid came to be parallel to the electrode inside the nozzle, but the *Examiner* too clearly understood Agie to be relying on both distinctions and made reference to both in the Statement of Reasons for Allowance. Agie would have this Court focus on just one sentence of those Reasons for Allowance (Agie Mem.Ex. 16 at 2):

> Further, it is considered that the apparatus [sic] of said references [including Lehmann] are incapable of flushing the fluid in the manner recited in the instant claims.

According to Agie, that sentence demonstrates that the Examiner understood Agie to be arguing only the differences in the fluid flow that would result downstream of the nozzle. But that sentence's introductory word "Further" plainly means that is not the only distinction that was brought to the Examiner's attention. And indeed the preceding sentence reads (*id.,* emphasis added):

> The analysis of the references made by applicants and Crookall in his declaration are convincing that the references relied upon *did not contemplate having the fluid exit the fluid supply means in the manner recited* in these claims.

Though that statement is somewhat cryptic, its reference to the way fluid "exit[s] the fluid supply means" has to be speaking of the way that the fluid flows before and as it exits the assembly, in contrast to the sentence quoted earlier in this paragraph, whose concern is obviously with the way that flushing occurs *in the working area.*[15]

In sum, Agie argued forcefully at the Reexamination that the internal structure of the '163 patent mattered in its own right—for its cooling and antivibration effects—and not merely for its ability to assure parallel flow along the wire downstream of the assembly. Agie is therefore estopped from now changing positions and arguing that the internal structure of the nozzle does not matter. That being true, there is no genuine issue of material fact as to the differences between the ways that the '163 patent and the New Assemblies operate. Hence Sodick is entitled to

---

on the Examiner, in favor of its current simplistic result-oriented comparison. As recently as September 19, 1990 its lawyers wrote this Court a letter (Exhibit 6 to this opinion) enclosing a photograph of a new Sodick machine in operation at the International Machine Tool Show here in Chicago earlier in the month. That photograph and Agie's forwarding letter respectively depicted and stressed only the resultant fluid flow downstream of the nozzle—totally ignoring the difference between the New Assemblies structure that produced such a flow and the '163 structure that produced a comparable flow at, as well as downstream of, the nozzle. Sodick's lawyers tendered a September 24 letter

(Exhibit 7 to this opinion) that properly calls Agie to task.

**15.** Agie's response, that this Court should read the words "in the manner recited" merely to be shorthand for something like "in such a way as to insure parallel flow downstream of the assembly," is entirely unconvincing. If read that way, the two sentences would say precisely the same thing in different words. But that cannot be, as the Examiner's use of the word "Further" to set apart the two ideas makes sense only if used to recite two separate and distinct reasons for allowance of Agie's claims.

summary judgment in its favor on Count II's request for a declaratory judgment that the New Assemblies do not infringe the '163 patent's claims.[16]

### Agie's Motion To Dismiss

Agie has moved to dismiss Count I for failure to state a claim for violation of the antitrust laws, Sherman Act § 2, 15 U.S.C. § 2 ("Section 2"). Count I generally charges Agie with having fraudulently procured patents for CNC wire EDMs and then using those patents to establish a monopoly by forcing its competitors either to go out of business or to pay Agie monopoly profits in the form of patent license fees (see *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 348, 15 L.Ed.2d 247 (1965) (attempts to enforce a fraudulently procured patent may violate Section 2 if the other elements of a Section 2 violation are also present)).

Agie challenges the sufficiency of Count I's allegations of (1) the relevant market and (2) Agie's current or threatened market power. It should be observed at the outset that Agie's entire approach to the matter—which is, after all, a threshold attack at the pleading stage—is at war with the definitive teaching of the Supreme Court, most recently repeated in *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984):

> At this stage of the litigation, we must accept petitioner's allegations as true. A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

Under that generous standard, this section of this opinion could well stop right here. But even if a more rigorous test is applied to Count I, once again neither of Agie's contentions has merit.

### 1. Relevant Product Market [17]

■ Count I ¶ 26 says:

> The relevant market for purposes of this counterclaim is the United States market for the sale of CNC wire EDM machines.

Later in that same paragraph Sodick alleges:

> The United States CNC wire EDM market is heavily concentrated, highly capital intensive and presents significant barriers to entry. It constitutes a distinct and identifiable product market.

Agie claims that Count I has failed to set out sufficient facts to support its "conclusory allegations" that CNC wire EDM machines are the relevant market in antitrust terms. But those allegations are no more conclusory than those that have been upheld by many courts, including this one. Thus in *SJ Advanced Technology & Manufacturing Corp. v. Junkunc*, 627 F.Supp. 572, 578 (N.D.Ill.1986) this Court rejected a similar argument:

> General also says SJ has not identified the relevant product and geographic markets. But ¶ 9 specifies the product market as a certain type of "aircraft jet engine component": "metal rings … referred to as 'fuel nozzle seals' or gaskets…." And ¶ 35 identifies the relevant geographic market.
>
>> Outside the Armed Services in the United States, there is no market for these seals.
>
> Those allegations withstand dismissal at this pleading stage.

In an effort to escape that seemingly obvious result, Agie attempts to distinguish *SJ Advanced Technology* as having involved "discrete product categories of limited application" (Agie R.Mem. 8). But that puts the cart before the horse. Our notice pleading system requires only that such allegations give notice of what markets are being brought into issue. Wheth-

---

**16.** This opinion therefore need not address either Sodick's alternative theory supporting summary judgment—that the New Assemblies simply practice prior art—or Agie's response that a factual issue remains as to whether the modifications that Sodick made to the Lehmann design were obvious in light of engineering knowledge as it existed *before* the '163 patent's teachings.

**17.** See the Appendix for a revelation of what appears to be a particularly troublesome aspect of Agie's asserted position on this subject.

er or not the alleged market is in fact the relevant one—whether it is a "discrete product categor[y] of limited application"—is a matter for proof and not pleading. *Walker Process Equipment,* 382 U.S. at 178, 86 S.Ct. at 350 (emphasis added) said as much:

> There may be effective substitutes for the device which do not infringe the patent. This is a matter of *proof,* as is the amount of damages suffered by Walker.

Agie next cites to *International Television Productions Ltd. v. Twentieth Century–Fox Television,* 622 F.Supp. 1532 (S.D.N.Y.1985) and *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674 (S.D.N.Y. 1987). But neither of those cases bears any resemblance to the situation at hand.

*International Television,* 622 F.Supp. at 1539 dismissed a complaint under Section 1 of the Sherman Act in part because its relevant market allegation ("the development, production, and distribution of television shows and series") was too vague and too broad to explain what market had allegedly been monopolized. In contrast, Agie cannot seriously contend that Sodick's allegation of "CNC wire EDM machines" is either vague or broad or that Sodick could possibly have been more specific in stating precisely what market Count I referred to.

At another extreme, *Shaw,* 673 F.Supp. at 678 rejected an antitrust plaintiff's allegation that Rolex watches could "constitute a product market unto themselves." That rejection necessarily followed from *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), which held that a single trademarked product cannot constitute a relevant market, at least not unless there are no reasonably interchangeable products in competition with it. *Shaw,* 673

F.Supp. at 678–79 found it so implausible that Rolex watches would not be "reasonably interchangeable with other high quality timepieces" that it dismissed the complaint there, even though ordinarily a dispute over the relevant product market would merely raise a question of fact not amenable to resolution on a motion to dismiss. Because Sodick's allegation is not at all similarly implausible, the appropriate course is to require Sodick to prove its allegation, not to dismiss it as a matter of pleading.

Nor does Agie strengthen its position by claiming that the market allegation is contradicted by Count I's other allegations. Those allegations include the Count I ¶ 26 description of CNC wire EDM machines as "tools used much like jigsaws for cutting metal or other electrically charged conductive materials such as ceramics," the categorization in Count I ¶ 27 describing those machines as a type of "electoerosion machine[ ]" (a more general category that also includes electrochemical machines) and the assertion in Count I ¶ 28 that CNC wire EDM machines are used to manufacture "components for a wide array of products, from watches to military aircraft." Agie would have this Court infer from those explanatory remarks that there must be a broader market of products that are reasonably interchangeable with CNC wire EDM machines. But regardless of whether the inference that Agie urges is plausible or the evidence for it is persuasive,[18] Sodick as the party opposing the motion to dismiss is entitled to all reasonable inferences in its favor. Because it is just as reasonable to infer from Sodick's pleadings that the CNC wire EDM machine is a distinct species of cutting tool that, although adaptable to a broad range of applications, has such unique characteristics that other

---

**18.** Of course this opinion intimates no opinion as to whether Agie's claimed inference is in fact appropriate. But it is hard to escape the sense that Agie's current argument proves far too much. Far from compelling an inference that the relevant market should (for example) include both CNC wire EDM machines and jigsaws, Sodick's analogy to the jigsaw was obviously intended only to provide a real-world illustration of the otherwise abstruse technical descriptions that patent lawyers thrive on. Thus a rough analogy to Agie's argument would

be to say that a description of the Space Shuttle as operating "like an airplane" and as adaptable to carrying a wide variety of payloads carries with it an inference that an airplane would serve as an adequate substitute for the Space Shuttle. Although taking Agie's argument to such an extreme does not do justice to Agie's legitimate concern that *some* cutting tools may be interchangeable with CNC wire EDMs, it shows at best that Agie's contention raises an issue of fact as to whether such effectively substitutable products really do exist.

cutting tools cannot be considered adequate substitutes, this Court cannot find Sodick's allegation insufficient as a matter of law.

### 2. Market Power

■ As for Agie's claimed market power, Count I contains the following relevant allegations:

138. As construed by AGIE, the asserted claims of the '163 patent are so broad that any manufacturer of wire EDM machines who wished to sell its machines in the United States would have to obtain a license under the '163 patent or risk being sued by AGIE.[19] The '163 patent therefore dominates the United States market for the sale of CNC wire EDM machines. As construed by AGIE, the asserted claims of the '819 and '270 patents are so broad that any manufacturer of wire EDM machines who wished to sell machines in the United States with automatic wire threading would have to obtain a license under the '819 and '270 patents or risk being sued by AGIE.

\* \* \* \* \* \*

130. On January 19, 1989, AGIE and Elox caused a petition to be filed with the ITC requesting that the ITC commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, against Sodick and its United States distributors and a Japanese distributor based on claims of the '163 patent. AGIE alleged in the petition that it was in the process of establishing a United States wire EDM industry through Elox. AGIE requested that the ITC issue an order excluding Sodick's wire EDM machines from the United States market for the life of the '163 patent. . . .

131. On March 8, 1989, based on AGIE's petition, the ITC commenced an investigation against Sodick and its distributors.

\* \* \* \* \* \*

141. Upon information and belief, AGIE and its licensees under the '163 patent control more than 80% of the United States market for the sale of CNC wire EDM machines and have a dangerous probability of successfully monopolizing that market. Upon information and belief, AGIE and its licensees under the '819 patent control more than 75% of the United States market for the sale of CNC wire EDM machines and have a dangerous probability of successfully monopolizing that market. Upon information and belief, AGIE's licensees have passed along all or part of their multimillion dollar license fees to United States consumers of CNC wire EDM machines in the form of higher prices.

Agie's motion attacking the sufficiency of those allegations rests on a two-step argument. First Agie insists that Sodick cannot attribute to Agie the market shares of Agie's licensees. And next, without such attribution Agie Mem. 11 places Agie's share of the market at barely 10% (and declining), a figure that it says is less than is necessary to show a dangerous probability of acquiring monopoly power. Neither of those steps enables Agie to prevail at the very threshold of Sodick's antitrust claim.

As for the first step, Agie lists a number of factors that it claims preclude attribution to Agie of its licensees' market shares. Agie Mem. 12–13 argues that the licenses could not have any competitive significance because:

1. Most of the licenses were worldwide in effect, without any allocation of the license payments between United States and overseas markets.

2. As a share of the total value of the United States and world markets involved, the amounts paid to Agie on the licenses "can hardly be characterized as monopoly profits" and could have no impact on consumer prices.[20]

---

**19.** [Footnote by this Court] Count I ¶¶ 101–25 recite the numerous licensing agreements that Agie has entered into covering the patents at issue here.

**20.** Agie Mem. 15–16 claims that any effect on the United States prices of CNC wire EDM machines of even a total pass-through to American consumers of the license fees for United States patents would be de minimis and that Sodick fails to allege that the license fees have had any

3. All payments were made in settlement of potentially expensive actual or threatened litigation.

4. No licensee was "deterred or prevented from competing in any market."

Whatever conclusion could ultimately be drawn from those factors if they were to be established,[21] they would all go to the merits of the extent of Agie's market power, not to the sufficiency of Agie's allegations of such power. Consideration of such factors is therefore premature.

Seemingly more significant is Agie's claim that its licenses could not impart market power because none places any restrictions on, or gives Agie any control over, the price or output of Agie's licensees. Agie looks to language in *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir.1984) that suggests that any "rational profit-maximizer" attempting to take advantage of a *Walker Process*-type antitrust violation:

> would charge its licensees a royalty designed to extract from them all the monopoly profits that the patent made possible; and the licensees would raise their prices to consumers to cover the royalty expense.

discernible effect on the market. As for the size of any price increase that may be attributable to the license fees, that is a factual issue that cannot be resolved here. As for the claimed failure to allege any discernible effect on the market, Agie is simply wrong. Sodick's allegation could hardly be more clear (Count I ¶ 141, emphasis added):

> Upon information and belief, AGIE's licensees have passed along all or part of their multimillion dollar license fees to United States consumers of CNC wire EDM machines *in the form of higher prices.*

**21.** It is hard to know which is more bizarre: Agie's reliance on the fact that the license fees were settlement payments, or its claim that no one has been deterred "in any way" from competing with Agie. As to the first, Agie seems to suggest that those payments were therefore not attributable to royalties and accordingly added nothing to Agie's market power. Only a moment's thought is required to see just how ludicrous such a position is, where the very gravamen of Sodick's antitrust counterclaim is Agie's use of just such litigation and threatened litigation to extort large payments from anyone seeking the privilege of competing with Agie. As to the second, if Sodick's counterclaim is to be

Agie finds similar references to continuing royalty arrangements in *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 n. 49 (7th Cir.1971) and *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 161–62 (7th Cir.1972)—both cases on which Sodick relies—and Agie seeks to distinguish those cases on that basis. Agie puts particular store in the fact that *Bendix, id.* at 162 distinguished *Kearney & Trecker* on the ground that the invalidation of the Bendix patent cancelled all continuing royalty agreements, "thus terminating plaintiff's ability to consummate any monopoly."[22] Be that as it may, if Agie would read the next paragraph of *Bendix* it would see why this Court may not find *as a matter of law* that a continuing royalty arrangement is a prerequisite to any finding that a patent that has been licensed may still pose a dangerous potential for monopoly power (*id.*, statutory citation omitted):

> All of those facts and pertinent precedents, however, simply emphasize that in this case the question of potential monopoly power is exceedingly delicately balanced on several fine lines and we should not purport to rely upon its existence or non-existence if in fact the defendants have not met their burden of demonstrating that plaintiff's conduct "injured

believed (as it must be at this stage), every licensee was deterred just enough to convince it that payment of the license fee was better than its risking protracted litigation by Agie.

**22.** Agie actually misstates the relevant discussion in *Bendix, id.* Instead of distinguishing *Kearney & Trecker* solely because the royalty agreements had been terminated there, the court said in *Bendix*:

> [I]t is noteworthy, if not distinguishing, that [in *Kearney & Trecker*] the intervening event was exposure of a fraud on the patent office and engaging by the patentee in predatory conduct, whereas here the issuance of the patents was procured in good faith by the plaintiff and the intervening agent was this Court's holding that the patents were invalid. Once petition for certiorari was denied, all of plaintiff's agreements based on the invalidated patents were cancelled (A.565), thus terminating plaintiff's ability to consummate any monopoly.

That obviously leaves open the question whether the result would have been different if the Bendix patent had been obtained by fraud without any royalty agreements.

[them] in ... [their] business or property." 15 U.S.C. § 15.

If *Bendix* was unwilling to ground its ruling, even after a trial on the merits, on the existence of monopoly power where the *combined* market position of the patentee and its licensees was 31.2% and the continuing royalty arrangements had been terminated, this Court can hardly find compelling precedent in that case for dismissing Sodick's Counterclaim at the pleadings stage on the sole ground that Agie had no continuing royalty arrangements.

As a practical matter too, this Court sees no reason why the finding of a *Walker Process*-type violation would be precluded simply because the purported violator licensed out the patent on terms that differed from the traditional ongoing royalty arrangement. For example, nothing suggests that a patentholder could not come close to achieving the same result by charging a lump sum that approximates the present value of the royalty payments that the patentee-licensor could expect to receive from sales by the new entrant into the market.[23] At least that is a possible inference to be drawn from Sodick's current allegations, and it is sufficient to state a cause of action at the pleadings stage.

Agie finally suggests that the '163 patent could not give rise to a dangerous probability of gaining monopoly power anyway because, as the preceding section of this opinion has shown, Sodick thinks itself able to design around that patent via prior art. But at the same time Agie strenuously implores this Court to prevent Sodick from doing just that. And of course that is the point of Sodick's Counterclaim—it was precisely Sodick's desire to defend against Agie's attempts to prevent Sodick from designing around Agie's allegedly fraudulently procured patent that spawned Count II. In any case, it is a question of fact whether Sodick—or anyone else—can produce a machine along the lines of the Lehmann patent that can actually provide Agie with meaningful competition.

And as for Agie's second step, even if it were correct in urging that its licensees' market shares could not be attributed to Agie, this Court still could not dismiss Sodick's pleading.[24] Even a figure of 10% market share might, given the right competitive circumstances, give rise to significant market power. It is simply too early to make a dispositive determination on such a factual issue.

### Conclusion

Because Agie is legally estopped from claiming that the New Assemblies are substantially equivalent to the '163 patent, there is no genuine issue of material fact on Counterclaim Count II. Accordingly Sodick is entitled to a judgment as a matter of law declaring that the New Assemblies do not infringe the '163 patent. And because Counterclaim Count I states a cause

---

**23.** Of course the determination of how much of a lump sum to charge would be complicated by the fact that the effect on prices—and hence the "monopoly profits"—of a new entrant into the market would depend on the output of the new entrant and the price elasticity of demand for the product. Therefore the monopolist that was out to capture the monopoly profits for itself via such a lump sum would have to guess at the correct amount to charge. Most such business calculations are as much art as science, however, and whether or not one's prediction in fact allowed the capture of most of the monopoly profits is a matter of proof and not of pleading. At the same time, such seat-of-the-pants economic intuition may indeed be wrong, and conditions in the relevant market (or any market for that matter) may make it impossible for an aspiring monopolist to capture monopoly profits without price or output restrictions in its licenses. But that only underscores the necessity for this Court to avoid making advance judgments as to such technical economic issues, before it receives any elucidation by experts in such matters.

**24.** It bears repeating that Agie's asserted 10% market share figure is nowhere to be found in the pleading under attack—it comes instead out of *Agie's* Mem. 11 (an odd source indeed for judicial consideration in a Rule 12(b)(6) motion):

> Sodick elsewhere has conceded that Agie's market share has declined to about 10%, the same as Sodick itself.

But even apart from that more-than-technical problem with Agie's motion, Sodick correctly points out that Agie simply ignores whatever market share belongs to its sister corporation Elox Corporation, a January 1988 acquisition of Agie's parent holding company (Counterclaim ¶¶ 24, 103, 130–33). In all events *that* market share is ascribable to Agie.

of action under Section 2 of the Sherman Act, Agie's motion to dismiss that count is denied.

## APPENDIX

As the text of this opinion reflects (see page 1316), one integral component of Agie's motion to dismiss Sodick's Count I antitrust counterclaim is Agie's attack on "the United States market for the sale of CNC wire EDM machines" as the relevant market (Count I ¶ 26). Just after briefing was completed on that motion, Sodick reported to this Court by a July 5, 1990 letter (with a copy to Agie's counsel, of course) that it had just learned of allegations made by Agie on August 31, 1982 in this District Court in the course of asserting Agie's own antitrust counterclaim in *Colt Industries Operating Corp. v. AG Fur Industrielle Elektronik AGIE*, Case No. 79 C 5246. Here (with emphasis added) is what Agie alleged there in its Amended Counterclaim VI, advanced (as is Sodick's Count I claim) under Section 2 of the Sherman Act, 15 U.S.C. § 2:

> 3. Vertical EDM Equipment and *Wire EDM Equipment each constitutes a relevant and distinct product submarket* in which competition in the sale of such equipment should exist and can be measured.
>
> 4. The United States constitutes a relevant and distinct geographic market in which competition in the sale of *Wire EDM Equipment* should exist and can be measured. There are no relevant geographic submarkets.[1]

Lest there be any mistake about that terminology, Agie's Counterclaims in that action defined "Wire EDM Equipment" in a manner that matched Sodick's use of the same concept here, defining that term as machining that uses "numerical or computer controls." And all those allegations were made by Agie's current lawyers in *this* case—a former Attorney General of the United States and members of two reputable Chicago law firms![2]

Another former Attorney General and one of our country's most distinguished legal scholars, Edward H. Levi, has taught in his slender but powerful work *An Introduction to Legal Reasoning* (1949) about the specialized form of "logic" that underpins all legal analysis. Although not phrased there in precisely the following terms, the same explanation also helps us to understand why lawyers do not necessarily prostitute themselves when they argue—as they frequently must—for what initially strikes them as making the worse appear the better cause: In the very process of explaining the similarities between the current case and the precedents that a lawyer seeks to invoke, while at the same time emphasizing the differences between the current case and precedents that the lawyer must distinguish, the lawyer's mindset may gradually shift to perceiving what had appeared at the outset as an indefensible position as not only defensible but actually the "right" one.

No such rationalization can support the conduct of Agie's counsel in advancing one position on its behalf in one lawsuit and the 180° polar opposite of that position in this case.[3] Agie has offered no response to Sodick's letter,[4] but if Sodick is indeed accurate (as this Court's examination of the

**1.** [Footnote by this Court] Essentially the identical allegations were contained in Agie's Amended Counterclaim V ¶¶ 3 and 4, which also identified EDM Equipment as "a relevant and distinct product market" of which the submarkets just referred to in the text quotation were a part.

**2.** Parenthetically (or maybe not so parenthetically) this Court has noted that one of the counterdefendants in that earlier Agie counterclaim was Fujitsu Fanuc, Ltd., apparently the same party that is now identified in Sodick's Counterclaim ¶¶ 105 and 106 as having paid Agie $2 million in November 1982 for a license under the '163 and other Agie patents—and therefore as representing part of the market share that Sodick seeks to lay at Agie's doorstep.

**3.** Because the text of this opinion has demonstrated a number of independent reasons for rejecting Agie's current position on the merits, it is unnecessary to look into the questions whether estoppel or judicial admission or some other legal doctrine might foreclose the very assertion by Agie of that position here.

**4.** Sodick's current memorandum filed in response to Agie's motion to dismiss Sodick's Count III claim again mentions the same subject of Agie's earlier and wholly inconsistent position (Mem. 13 n. 11).

**1322** 

pleadings in the earlier case indicates) nothing at all would appear to separate Agie's lawyers (members of what we like to think of as a noble and learned profession) from the "oldest profession." [5]

FIG. 2

FIG. 3

EXHIBIT 1

5. Webster's Third New International Dictionary 1570 (1976 ed.).

Fig 4

EXHIBIT 2

1324

Guide cover
(MW403028A)

Wire(Electrode)

Wire Guide(Die)

Nozzle
(MW403129A)

S11393 - Assembly (Upper Wire
Guide with AWT)

EXHIBIT 3

Wire Guide (Die)
(MW300423A)

Nozzle and Water Guide
(MW403069A)

Wire (Electrode)

EXHIBIT 4

1326

Lehmann Patent

wire (7)
die (12)
channel (23)
channel outlet

Sodick New Assembly

wire
nozzle
duct outlet
duct

This is what Agie claims to be "a portion defining an outlet" recited in the Five claims of the '163 Patent.

'163 Patent

wire
duct (28)
duct outlet

Sodick's Prior Assembly

wire
duct
duct outlet
20° included angle

EXHIBIT 5

## EXHIBIT 6

**NEUMAN, WILLIAMS, ANDERSON & OLSON**

ATTORNEYS AND COUNSELORS

77 WEST WASHINGTON STREET

CHICAGO, ILLINOIS 60602–2954

September 19, 1990

The Honorable Milton I. Shadur
United States District Court
219 South Dearborn Street
Room 2388
Chicago, Illinois 60603

Re: Agie v. Sodick
*Civil Action No. 87 C 8974*

Dear Judge Shadur:

As you know, you have before you Sodick's motion seeking summary judgment that its wire EDM machines equipped with its recently "redesigned" wire guide and flushing assemblies, do not infringe certain claims of plaintiff Agie's '163 patent. In Agie's view, the nature of the fluid flow discharged from the assemblies as a whole is important to a determination of infringement.

The International Machine Tool Show occurred in Chicago at McCormick Place during September 5–13, finishing just last week. The principal machine tool manufacturers of the world put their products on display at that show for inspection by customers and potential customers. Both Agie and Sodick exhibited their wire EDM machines at the show.

At least some of Sodick's wire machines were displayed during that show under the operating conditions which Agie contends result in infringement of the '163 patent. The enclosed photograph taken on September 7 at the show is of a Sodick EPOC 1100 wire EDM machine operating under such conditions. Agie believes that Sodick's display of its machines operating under these conditions at the show demonstrates the importance which Sodick places on achieving a flushing fluid flow like that described and claimed in Agie's patent, and

therefore wanted to bring these facts to the Court's attention.

Thank you for your consideration of this matter.

Very truly yours,
Neuman, Williams,
Anderson & Olson
By (s) James T. Williams
James T. Williams

JTW/krs

Enclosure

cc: Alan L. Unikel, Esq.
Paul Devinsky, Esq.
P. Jay Wilker, Esq.

## EXHIBIT 7

**MARKS MURASE & WHITE**

ATTORNEYS AT LAW

SUITE 750

2001 L STREET, N.W.

WASHINGTON, D.C. 20036

CABLE WEMULAW WASHINGTON DC

(202) 955–4900

INTERNATIONAL TELEX 248749

TELECOPIER (202) 955–4933

September 24, 1990

BY MESSENGER

Honorable Milton I. Shadur
United States District Court
219 South Dearborn Street
Room 2388
Chicago, IL 60603

Re: Agie v. Sodick
*Civil Action No. 87 C 8974*

Dear Judge Shadur:

Late on Wednesday afternoon, September 19, 1990, we received, by facsimile, a copy of Mr. James T. Williams' letter to you of that same date. Sodick is somewhat puzzled by this letter, as it appears to be no more than an improper rehash of Agie's

argument that its flushing patent covers *any* structure which can or will result in a coaxial flushing stream, even one which only exits downstream of the claimed "outlet."

In Mr. Williams' letter, Agie focuses its attention on "the nature of the fluid flow discharged from the assemblies as a whole" as being "important to a determination of infringement."[1] As explained in Sodick's Reply Memorandum in Support of its Motion for Partial Summary Judgment (Sodick Reply Brief), this superficial statement ignores the structural means recited in the claim language, ignores the flushing structure depicted and described in Agie's patent, and ignores the required function/way/result test[2] (see Sodick Reply Brief, Part III).

Most importantly, however, Agie's confusing allegation ignores limitations on possible infringing structures imposed on the scope of Agie's flushing claims[3] by the prior act (Lehmann) (see Sodick Reply Brief, p. 25, *et seq.*).

Finally, Agie's distorted "belief" concerning the importance of flushing flow, as it relates to the Sodick Model EPOC–1100L demonstrated at the 1990 IMTS[4] is totally unfounded. In that demonstration, the subject machine equipped with a Sodick L–Type flushing nozzle,[5] was cutting Sodick's logo mark into a very large workpiece. The logo mark is a very intricate

shape which includes the word "SODICK" superimposed on an oval depiction of a global map, as well as other graphics. It was the machine's ability to make intricate cuts on a large workpiece which was the object of the demonstration. To characterize this as a demonstration of the machine's ability to achieve a flushing fluid flow "like that *described and claimed* in Agie's patent" (emphasis added) is a distortion bordering on the disingenuous.[6]

In view of the above, Sodick believes it could not let Agie's September 19, 1990 letter go unanswered.

Thank you for your consideration.

Very truly yours,

By (s) Paul Devinsky
Paul Devinsky

PD/er

Encl.

cc: James T. Williams, Esq. (w/o encl.)

Alan L. Unikel, Esq. (w/o encl.)

P. Jay Wilker, Esq. (w/o encl.)

(all by facsimile)

---

1. It is noted that Mr. Williams now apparently feels competent, without reliance on either of his experts (Crookall or McDonald) and based solely on his own observation and photographs, to advise the Court as to what the claims means and what flows (regardless of nozzle structure) infringe.

2. It should be recalled that Agie only alleges infringement under the doctrine of equivalents. However, Agie's letter does not even purport to address the "function" or "way" part of the three-part test for infringement under that doctrine.

3. Under the doctrine of equivalents, permissible claim scope is limited, *inter alia,* by the prior art.

4. International Machine Tool Show.

5. Mr. Williams, in a September 19, 1990 letter to the undersigned (Attachment A hereto) even

went so far as to wrongfully accuse Sodick of demonstrating its EPOC–1100L with a non-L-Type nozzle—a fact which dramatically demonstrates the very serious implications the Lehmann reference brings to bear on the issue of validity.

6. Further, as far as Sodick can determine from the quality of its facsimile copy of Agie's September 19, 1990 letter, the appended photograph fails to show the flushing fluid discharged at the location of interest *described and claimed* in Agie's patent, i.e., the duct *outlet.* The photograph only appears to depict flow *downstream* of the nozzle. Regardless of what the Court finally determines the "outlet" of the accused Sodick structure to be (see Sodick Reply Brief, Sections II and III), Agie scrupulously *avoided* including it in its photograph.