**ROLITE, INC., Plaintiff,**

v.

**WHEELABRATOR ENVIRONMENTAL SYSTEMS, INC., and WMX Technologies, Inc., Defendants.**

**Civil Action No. 94–5894.**

United States District Court, E.D. Pennsylvania.

March 25, 1997.

Robert A. Swift, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, David H. Weinstein, Robert S. Kitchenoff, Paul J. Scarlato, Weinstein, Kitchenoff, Scarlato & Goldman, Ltd., Philadelphia, PA, for Rolite, Inc.

Roberta D. Liebenberg, Mager, Liebenberg & White, Philadelphia, PA, Kenneth J. Rudofski, Kyle K. Kappes, Richard A. Clegg, Paul H. Berghoff, Allegretti and Witcoff, Ltd., Chicago, IL, Natalie Finkelman, Mager, Liebenberg & White, Philadelphia, PA, for Wheelabrator Environmental Systems, Inc., WMX Technologies, Inc.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

On September 27, 1994, Plaintiff Rolite, Inc. filed a fivecount complaint against Defendants Wheelabrator Environmental Systems, Inc. and its corporate parent, WMX Technologies, Inc., seeking a declaratory judgment of non-infringement of Wheelabrator's patent and alleging various unfair trade practices. On November 6, 1995, I granted Rolite summary judgment with regard to the patent claim (Count I of the Complaint), finding that, based upon my interpretation of the patent, Rolite could not be held to have infringed upon the patent in question. After a number of deadline extensions due to the complexity of the case, Rolite filed an Amended Complaint on July 10, 1996, which sought the following: (1) injunctive relief and treble damages for Defendants' alleged violation of Section 2 of the Sherman Act (Count II); (2) injunctive relief and treble damages for Defendants' alleged violation of Section 1 of the Sherman Act (Count III); (3) injunctive relief and treble damages for Defendants' alleged violation of Section 43(a) of the Lanham Act (Count IV); and (5) damages for alleged violations of state laws against unfair competition, defamation, commercial disparagement, and tortious interference with prospective business advantage (Count V). Defendants have moved to dismiss Counts II and III and parts of Count V pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons that follow, I will grant their motion in part and deny it in part.

## I. SUMMARY OF FACTS AS ALLEGED IN THE AMENDED COMPLAINT

For the purpose of this dismissal motion, I must take to be true all facts alleged by Rolite in its Amended Complaint. I will briefly review those facts. All parties are involved in municipal waste management, and both Rolite and Wheelabrator operate systems for the conversion and recycling of ash residue ("Ash Residue Waste" or "ARW") from waste incinerators. Wheelabrator holds a patent, United States Patent No. 4,804,147, for its recycling procedure. This patent lapsed on August 14, 1992 due to Wheelabrator's failure to pay a maintenance fee, but was reinstated on February 14, 1994, after Wheelabrator petitioned for reinstatement and payed the maintenance fee and late fees.

Rolite claims that on several occasions Wheelabrator has accused Rolite of infringing upon its patent through Rolite's process for making ash residue into "Rolite Aggregate," and that Wheelabrator threatened litigation if the alleged infringement did not cease. Additionally, Rolite alleges that representatives of one or both Defendants have stated to Rolite's customers or potential customers that Rolite's process infringes Wheelabrator's patent, and have misrepresented to

customers and potential customers the nature, characteristics, and qualities of Rolite Aggregate. Furthermore, Rolite has been compelled to disclose the infringement claim and threats of suit as material facts to existing and potential investors. Rolite claims that the effect of the statements and misrepresentations by Defendants and the disclosure by Rolite has been to discourage customers and potential customers from dealing with Rolite.

## II. DISMISSAL STANDARD

In moving to dismiss Rolite's antitrust and state tort claims at the pleading stage, Defendants must meet a very high standard. Addressing summary dismissal generally, the Supreme Court has stated: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claims and defense and to define more narrowly the disputed facts and issues." *Conley*, at 47–48, 78 S.Ct. at 103 (footnotes omitted).

The dismissal standard is even higher in antitrust cases than it is generally: "[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *see also Hospital Bldg. Co. v. Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976)("[I]n antitrust cases, ... dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."); *Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988)("[W]e should be extremely liberal in construing antitrust complaints." *Quoting Knuth v. Erie–Crawford Dairy Co-op. Ass'n*, 395 F.2d 420, 423 (3d Cir.1968), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973)); *Abbott Laboratories v. Brennan*, 952 F.2d 1346 (Fed.Cir. 1991), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992) ("In an antitrust action, the complaint need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." (Internal quotations and citations omitted)).

At least two circuits, however, have declined to adhere strictly to the high standard seemingly set by *Conley* and *Hishon.* In *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985), the Court of Appeals for the Seventh Circuit said the following:

> [A]s this court has recognized, *Conley* has never been interpreted literally. *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 654 (7th Cir.1984). In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* at 654 (*quoting In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir.1981), *cert. dismissed*, [462] U.S. [1125], 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983)).

*Id.* at 1106.

In this Circuit, it has been held that, "[e]ven given the teachings of *Conley*, ... the plaintiff must allege sufficient facts in the complaint to survive a Rule 12(b)(6) motion." *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988). "[T]he court must review the allegations of fact contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Id.* The Court of Appeals quoted the Supreme Court in *Associated Gen. Contractors of Cal. v. California State*

*Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983), which said that "[a]s the case comes to us, we must assume that the [plaintiff] can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Id.* at 180.

It should be noted, however, that the Court of Appeals, in dismissing the complaint in *PepsiCo,* pointed out that this case came under the Soft Drink Act, and stated that "[b]ecause the soft drink industry is involved, [the plaintiff] has a pleading burden much higher than that in a mine-run antitrust complaint." *Id.* at 181. This is so because "the Soft Drink Act was enacted to remove certain soft drink industry practices from the reach of the antitrust laws...." *Id.* at 175. "Congress decided that the distribution practices of the soft drink industry merited special protection on the theory that territorial restraints foster the competitive spirit by encouraging each bottler to invest and promote in its own territory." *Id.* at 179.

## III. MOTION TO DISMISS COUNTS II AND III

### A. Failure to Allege Relevant Product Market

■ Defendants contend that Rolite's monopolization, attempted monopolization and conspiracy to monopolize claims (Count II) under Section 2 of the Sherman Act should be dismissed for failure to allege a relevant product market. They further contend that Rolite's conspiracy to restrain trade claim (Count III) under Section 1 of the Sherman Act should be dismissed for the same reason.

To state a claim of monopolization under Section 2 of the Sherman Act, a plaintiff must allege (1) possession of monopoly power in the relevant product and geographic market, and (2) willful acquisition or maintenance of that power as distinguished from justifiable business decision. *U.S. v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Thus, a

plaintiff must allege a relevant product market to plead a monopolization claim under Section 2. The same is true of attempted monopolization and conspiracy to monopolize claims under that section. Scher, Irving, *Antitrust Adviser,* 4th Ed., § 1.22, at 1–40 and 1–41. Finally, conspiracies to restrain trade under Section 1 of the Sherman Act that are not *per se* violations of the Act are analyzed under the "rule of reason," and involve an inquiry into "market structure designed to assess the combination's actual effect." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).[1] Therefore, relevant market must be pled with regard to Section 1 conspiracy claims as well. Defendants maintain that Rolite has failed to adequately plead the relevant product market, and that dismissal of these claims is therefore warranted.

Defendants state that Rolite's description of the relevant product market in its Amended Complaint is "confined to but a single paragraph." Paragraph 178 alleges: "There are two service markets relevant hereto: (i) the landfill disposal of Ash Residue Waste and Ash (the 'Disposal Market'), and (ii) the recycling or treatment of Ash (the 'Recycling Market'). Alternatively, the Recycling Market and the Disposal Market may be viewed as separate submarkets within a larger market encompassing both."

These "skimpy and conclusory allegations," Defendants say, are patently insufficient to plead a relevant product market because:

(1) they fail to provide any guidance as to precisely what products are in the Recycling Market;

(2) they fail to provide any guidance as to what reasonably interchangeable products are in the Recycling Market; and

(3) they fail to provide any guidance as to the identities of the companies that compete in the Recycling Market.

Defendants then cite a number of cases in which they say monopolization claims have been dismissed because the plaintiff has failed to adequately plead the relevant market.

---

**1.** Rolite does not dispute the contention that it is not claiming a *per se* violation.

Rolite points not only to Paragraph 178, but also to Paragraphs 179 and 180, in which it lays out the relevant geographic market (the adequacy of which pleading Defendants do not contest), and 16 other paragraphs which Rolite claims provide "factual context" to the market definition laid out in Paragraphs 178–180 and "amply establish the basis for the alleged relevant markets." These paragraphs discuss what Ash Residue Waste is, how long term disposal contracts have historically comprised almost the entire market, the new recycling technology developed by Rolite, and some further history of the dispute.

Rolite claims that it needs to show neither what products and reasonably interchangeable products are in the Recycling Market (which it says are actually one issue), nor what companies compete in the market, in pleading its claim. It cites for the proposition a case from the Northern District of Illinois, *A.G. Fur Industrielle Elektronik AGIE v. Sodick Co., Ltd.*, 748 F.Supp. 1305 (N.D.Ill.1990). It also attempts to distinguish those cases cited by Defendants from the present one.

None of the cases cited by Defendants say exactly what Defendants interpret them as saying, and none support a dismissal here. Several of the cases dismiss not for a general failure to adequately plead a relevant market, but rather for a failure to plead facts that would be necessary for the court to determine that the relevant market should be defined as narrowly as the plaintiffs attempt to, which narrowness is necessary for their claims of monopolization. For instance, in *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162 (S.D.N.Y. 1995), plaintiff defined the relevant market as that for chest equalization radiography technology, a new technology used for chest X-rays. However, the court found that "Plaintiffs' pleadings do not refer to any reasonably interchangeable alternatives, nor do they offer an explanation for why they are defining the relevant product market in such narrow terms." *Id.* at 172. "Indeed, without pleadings from Plaintiff asserting otherwise, it appears to the Court that chest equalization radiography is not an independent product market, but rather part of the overall X-ray market." *Id.* "Unless plaintiffs can show that chest equalization radiography is the relevant market, proof that defendants obtained their patents fraudulently does not translate into a showing of successful monopolization." *Id.*

Another case cited by Defendants, *Re–Alco Industries, Inc. v. Nat'l Center for Health Education, Inc.*, 812 F.Supp. 387 (S.D.N.Y. 1993), contained a similar holding. Plaintiff had not failed to define the relevant market, but rather had defined the market very narrowly, here for a particular brand of school health manual. The court said: "The complaint in an antitrust case must allege a basis for finding that commodities which are in some way unique, such as the educational materials in question here, are a market unto themselves. Plaintiff must explain why the market it alleges is in fact the relevant, economically significant product market." *Id.* at 391. "Plaintiff has made no showing why Growing Healthy materials should be considered a market unto themselves, as distinguished from the market suggested by defendants—all health education materials for elementary schools." *Id.* at 392. *See also Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348 (S.D.N.Y.1982) (cited by Defendants in their Reply, at 6)(Plaintiff defined the relevant market as the market only for international beauty pageants. "The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding the publicity potential offered by lesser pageants or different media." *Id.* at 1354); *Ford Piano Supply Co. v. Steinway and Sons*, 1988 WL 3488 (S.D.N.Y.) (cited in Defendants' Reply at 6) (Market for a particular brand of piano parts is not a market capable of competitive structure).

While Defendants do not explicitly argue this, they may be implying by citing these cases that Rolite has not alleged enough facts in the pleadings to support the narrow definition of the relevant market as the "Recycling Market" as opposed to a market definition which includes other disposal methods as well. However, I disagree with any such implication for three reasons: (1) I think that

Rolite has indeed pled facts sufficient to support its allegations that the Recycling Market is a market unto itself—in addition to the paragraphs Rolite cites, it has laid out the facts surrounding the waste disposal/recycling business throughout its amended complaint with enough specificity to convince me that the market for the recycling of Ash Residue Waste may be a market unto itself; (2) alternatively, it has alleged that the larger market, inclusive of other disposal methods, may be the relevant market; and (3) as is evidenced by Rolite's provision of this alternative market definition, and unlike the claims in the above-cited cases, Rolite's claim does not appear to be dependent upon the narrow definition.

Other cases cited by Defendants had antitrust claims that were dismissed not because plaintiffs failed to properly plead a definition for a relevant market, but rather because the relevant market definition which they did plead was not of a market that was an economically "viable" or "plausible" one. See E. & G. Gabriel v. Gabriel Brothers, Inc., 1994 WL 369147, at *3 (S.D.N.Y.) ("[T]he court finds plaintiff's alleged market to be implausible[, because, among other reasons,] Plaintiff's proposed market is comprised of products as varied as household hardwares and children's sleepwear."); Theatre Party Assoc., Inc. v. Shubert Organization, Inc., 695 F.Supp. 150 (S.D.N.Y.1988) (cited in Defendants' Reply, at 6)("Plaintiff's proposed market—advance sales of selected tickets to the early run of Phantom [of the Opera]—does not comprise a viable antitrust market." Id. at 154). Defendants do not contend that either the Recycling Market or the alternative combined Recycling and Disposal Market alleged by Rolite are not economically viable markets or are otherwise implausible.

Defendants also cite Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F.Supp. 1055 (E.D.Pa.1996). However, they misread the opinion of the Honorable J. Curtis Joyner. Judge Joyner did not dismiss, as Defendants contend, because the plaintiff failed to allege any, or to allege sufficiently, relevant market. Rather, he said the following:

> [A]ntitrust claims predicated upon a "relevant market" defined by the bounds of a franchise agreement are not cognizable. Thus, the amended complaint fails not because the purported relevant market arises from a single brand of product, but because the "market" was created by virtue of the franchise agreements Plaintiffs freely entered.

Id. at 1063 (emphasis added). Based upon this reasoning (and not, significantly, because their claims were not premised upon any pleaded relevant market), he concluded that "the relevant market on which Plaintiffs' antitrust claims are premised ... cannot support those claims as a matter of law." Id. at 1064.

Those cases which Defendants cite which do appear to dismiss antitrust claims for failure to adequately plead any relevant market at all make no allegations whatsoever as to what the relevant market is. See Ajax/ Acorn Manufacturing, Inc. v. Berman Sales Co., Inc., 1991 WL 224997, at *3 (E.D.Pa.) ("[P]laintiff's Complaint is deficient because it has failed to plead facts which would establish the relevant market threatened by the alleged price discrimination."); Curvcraft, Inc. v. Chromcraft, Inc., 193 U.S.P.Q. 371, 373 (E.D.Pa.1976) ("[D]efendant has not alleged in its counterclaim what the relevant market is.").

In the one case cited by Rolite, AG Fur, supra, the district court for the Eastern District of Illinois denied a motion to dismiss an antitrust claim which contained the following cursory pleading defining a narrow relevant market: "The relevant market for purposes of this counterclaim is the United States market for the sale of CNC wire EDM machines....The United States CNC wire EDM market is heavily concentrated, highly capital intensive and presents significant barriers to entry. It constitutes a distinct and identifiable product market." Id. at 1316.

In sum, the cases cited by Defendants fall into four categories: (1) cases where the plaintiffs failed to plead facts that would support the extremely narrow relevant market definitions which were essential to their monopolization claims; (2) cases where the plaintiffs alleged a relevant market definition, but for a market which was implausible or not viable; (3) one case in which the

"relevant market" defined was one which was created by a franchise agreement which the plaintiffs had voluntarily signed; and (4) cases in which no attempt whatsoever was made in the pleadings to define the relevant market.

The cases in category (1) do not compel a dismissal here for the reasons discussed above. While Rolite's claim may depend upon the narrow relevant market definition (i.e. "Recycling Market" as opposed to market for all ash residue disposal), Rolite may be able to make out a monopolization claim without this narrow definition, and in any event has pled facts sufficient to support such a definition. The facts as extensively pled by Rolite also support its contention that the Recycling Market, or at least the "larger" Disposal and Recycling Market, are economically viable and plausible markets; therefore, Defendants' cited cases that fall in category (2) are also inapposite.

The *Queen City Pizza* case of category (3) does not apply here: in that case dismissal was explicitly dependent upon the existence of a franchise agreement. Finally, unlike the cases I have designated as being in category (4), Rolite has made some pleading defining what it believes to be the relevant market.

Thus, none of the cases cited by Defendants convince me that Rolite has failed to meet its pleading requirement. All either are inapposite or grant dismissal on the basis of inadequacy of pleadings where plaintiffs offer far less than what Rolite offers here.

In Paragraph 178 of its Amended Complaint, Rolite explicitly sets out what it believes the relevant markets to be. When this paragraph is looked at in conjunction with the 177 that precede it, many of which describe elements of the product and the market, there can be little confusion as to the market in which Rolite alleges that anticompetitive conduct has taken place, and Defendants therefore have adequate notice of this portion of Rolite's claim, as per *Conley*'s "notice pleading" requirement. Defendants cannot convincingly argue that they are not aware from Rolite's pleadings what the relevant market is. Rolite has adequately pled the relevant market under the standards set forth by the Supreme Court in *Conley* and *Hishon* and by the Third Circuit in *PepsiCo*.

For the reasons stated above, I will deny Defendants' motion to dismiss Rolite's Section 2 monopolization, attempted monopolization and conspiracy to monopolize claims and Section 1 conspiracy to restrain trade claim on the basis of failure to allege a relevant market.

## B. Failure to Allege Market Power

■ Defendants next move to dismiss Rolite's Section 2 claim for failure to allege Defendants' market power. As set forth above, to state a claim of monopolization under Section 2 of the Sherman Act, a plaintiff must allege (1) possession of monopoly power in the relevant product and geographic market, and (2) willful acquisition or maintenance of that power as distinguished from justifiable business decision. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). To demonstrate attempted monopolization, which is also prohibited by Section 2, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

Defendants claim that Rolite has alleged no facts which show that Wheelabrator actually possesses monopoly power, or that Wheelabrator possesses sufficient market power to present a dangerous probability of achieving monopoly power. Specifically, Defendants say, Rolite has not alleged any facts showing that Wheelabrator has the power to control prices or exclude competition or that it has a predominant share of the market.

Defendants attack the allegations of Paragraph 240 of the Amended Complaint, that Wheelabrator has attempted to monopolize the Recycling Market "by achieving the power to fix prices therein and/or to erect and maintain substantial barriers to entry of competition therein," as legal conclusions without any specific facts showing that Wheelabrator actually fixed prices or erected

substantial barriers to the entry of competition into the Recycling Market.

Defendants then state that the most significant factor in determining whether monopoly power exists, according to the Third Circuit, is the share of the market possessed by the alleged monopolist. They point out that nowhere in the Amended Complaint are there any specific facts regarding Wheelabrator's market share or from which it could be inferred that it has a substantial market share.

Finally, Defendants claim that Rolite is attempting to mask its failure to allege market power held by Wheelabrator in the Recycling Market by lumping the Recycling Market and Disposal Market into one "larger market" of which Wheelabrator and its parent and co-defendant WMX have a "large aggregate market share." This, Defendants say, is improper, since, "[a]s set forth in the Amended Complaint, the alleged monopoly relates only to the Recycling Market, and since only Wheelabrator (not WMX) competes in that market, Rolite's failure to set forth the share of the Recycling Market held by Wheelabrator renders its monopoly claim legally deficient." Defendants' Motion to Dismiss, at 15.

Rolite responds that, because a showing of "market share" is merely a substitute for a showing of monopoly power (or, more precisely, an indicator or evidence of monopoly power), and since it has alleged monopoly directly, it need not plead market share. It has alleged monopoly directly, it says, by alleging "both the ability to control prices in each of the two alleged relevant markets and the ability to erect substantial barriers to entry into those markets." Plaintiff's Response, at 13. It points to the following paragraphs in its amended complaint:

237. By reason of their large aggregate market share, their existing Long Term ARW Disposal Contracts, and Wheelabrator's wrongful attempts to enforce the Patent, among other things, the defendants, acting directly and through various subsidiaries and affiliates, have been able to fix and maintain prices in each of the relevant markets.

238. There have been substantial barriers to entry into each of the relevant markets.

239. Such barriers include, among other things, the necessary large investment of capital and know-how, stringent regulatory controls, the relatively limited supply of Ash Residue Waste and Ash by reason of existing Long Term ARW Disposal contracts committing large quantities of Ash Residue Waste and Ash, and Wheelabrator's Patent.

In response to Defendants' allegation that it is improper to allege Defendants' combined market share in the combined Disposal and Recycling Market, Rolite says that this ignores the averment that Defendants were operating as one entity set forth in Paragraph 8.

In their Reply, Defendants state that those paragraphs cited by Rolite simply "simply parrot[ ] legal conclusions without setting forth any facts...." Defendants further argue that Rolite's allegations as to Wheelabrator's ability to create barriers to entry are not accompanied by any facts, and are, moreover, refuted by Rolite's own and numerous other competitors' entries into the market. Finally, Defendants claim that Rolite has not alleged any facts supporting its conclusory assertion that Wheelabrator can fix and maintain prices.

■ Rolite is correct that it need not plead market share in its complaint in order to have adequately pled that Defendants possess monopoly power. While, as Defendants claim, market share may be a significant indicator of monopoly power, and perhaps even the "most significant" factor, *Pastore v. Bell Telephone Co. of Pa.*, 24 F.3d 508, 513 (3d Cir.1994), the Third Circuit has stated the following:

[A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive. Other factors to be considered include the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.

*Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98, 112 (3d Cir.1992) (citations omitted). *See also Pastore,* at 513 (listing factors to be considered in addition to market share); *Allen–Myland, Inc. v. International Business Machines Corp.,* 33 F.3d 194, 209 (3d Cir.), *cert. denied,* 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994) ("Market share, of course, is only one type of evidence that may prove the defendant has sufficient market power to impose per se antitrust liability. 'Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them.'" *Quoting Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1336 (7th Cir.1986)). Furthermore, while in *Pastore,* which is relied upon heavily by Defendants, the Court of Appeals affirmed a grant of summary judgment based upon the lack of market share, it must be noted that (1) that case was dismissed on summary judgment motion, and not at the mere pleading stage; and (2) there, the court found that Defendants did not have any share whatsoever in the relevant market.

■ I will first note that, to the extent that Rolite is claiming attempted monopolization, it need not allege that Defendants have monopoly power. According to the Supreme Court, "to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a *dangerous probability of achieving monopoly power.*" *Spectrum Sports,* at 456, 113 S.Ct. at 890–91 (emphasis added). Thus, actual possession of monopoly power is not an element of attempted monopolization, and it therefore need not be alleged by Rolite in order to plead an attempted monopolization claim.

2. It should be noted that the mere acquisition of a patent does not establish the existence of monopoly power. *Walker Process Equip., Inc. v. Food Machinery and Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1367 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

As to Rolite's actual monopolization claim, while the discussion above demonstrates that a showing of market share is not necessary, possession of monopoly power is indeed an element of a monopolization claim. *Grinnell,* at 570–71, 86 S.Ct. at 1704. Therefore Rolite must sufficiently plead Defendants' possession of monopoly power to state a monopolization claim.

Rolite claims that it has in fact alleged monopoly power, and points to Paragraphs 237 through 239 of the Amended Complaint. Essentially, Rolite's entire direct allegation as to monopoly power is in Paragraph 237, in which it states that "[b]y reason of their large aggregate market share, their existing Long Term ARW Disposal Contracts, and Wheelabrator's wrongful attempts to enforce the Patent,[2] among other things, the defendants ... have been able to fix and maintain prices in each of the relevant markets." While, as Defendants point out, Rolite makes no further allegations supporting its claim of Defendants' "large aggregate market share," it does discuss WMX's ownership of many landfills that benefit from Long Term ARW Disposal Contracts and how these comprise almost the entire Disposal Market (Paragraphs 20–22), Defendants' allegedly wrongful attempts to enforce the Patent (Paragraphs 73, 109–233), and the barriers to the relevant markets (Paragraphs 238–239).[3]

Rolite could certainly have included more specific facts pertaining to the issue of Defendants' monopoly power, such as what Defendants' market share is, what other firms, if any, operate in the relevant market(s), and what evidence there is that Defendants have fixed or maintained prices or can do so. However, Rolite is not required to do so at the pleading stage. *Conley* clearly states that "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To

3. As to Defendants contention that it was improper to allege a "large aggregate market share" in each relevant market, where "the alleged monopoly relates only to the Recycling Market," this argument is of no import. The argument not only mischaracterizes what Rolite says, but, more importantly, it fails to appreciate that it does not matter if Rolite has also alleged monopoly power in irrelevant markets as long as it has alleged it in the relevant market(s) as well.

the contrary, all the Rules requires is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47–48, 78 S.Ct. at 103 (footnotes omitted).

Nor am I persuaded of the inadequacy of Rolite's pleadings with regard to monopoly power under *PepsiCo,* where the Court of Appeals for this circuit stated that "the court does not consider conclusory recitations of law." *PepsiCo,* 836 F.2d at 179. The Amended Complaint here is not a bare complaint with little but conclusions to it. While Paragraph 237 may contain only a "conclusory recitation" regarding Defendants' alleged monopoly power, Rolite has set out in its complaint a great many factual allegations, several of which, discussed above, might if true support the inference that Defendants did possess monopoly power in one of the alleged relevant markets.

For the reasons discussed above, I will deny Defendants' motion to dismiss Count II on the basis of a failure to allege monopoly power.

### C. Failure to Adequately Plead a Monopoly Leveraging Claim

■ Defendants next move to dismiss Rolite's § 2 claim to the extent that it rests upon the theory that Wheelabrator is leveraging its ostensible monopoly power in the Recycling Market to gain competitive advantage for its parent, WMX, it the Disposal Market. In making this claim, Defendants say, Rolite relies on *Berkey Photo, Inc. v. Eastman Kodak,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), which was, they argue, expressly rejected by the Third Circuit in *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 203–206 (3d Cir.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Furthermore, Defendants claim, Rolite does not (and could not) allege facts that would allow it to meet the more stringent test for monopoly leveraging under *Fineman.*

Rolite responds that *Fineman* does not preclude its monopoly leveraging claim, and

makes several arguments to attempt to support this. It argues that:

(1) Defendants have mischaracterized its complaint. They ignore the allegations that Defendants have obtained the ability to fix and maintain prices in the Disposal Market and that harm to competition and to Rolite has arisen out of Defendants' monopoly of the Recycling Market, as well as the Disposal Market. (Rolite cites Paragraphs 237, 247–50 of its Amended Complaint). The acquisition of such monopoly power in the target market (Disposal) and Rolite's status as a competitor in the primary market (Recycling), Rolite claims, distinguish this case from *Fineman.* Here, as opposed to *Fineman,* "Rolite seeks damages for Defendants' conduct principally in the so-called leveraged market, as well as in the target market." Thus, Rolite avers, it has in fact alleged that Defendants have a threatened or actual monopoly in the Disposal Market by virtue of their ability "to fix and maintain prices in *each* of the relevant markets." Amended Complaint, Paragraph 237 (emphasis added in brief). This ability to set prices in the target market, Rolite concludes, distinguishes this case from *Fineman* and places it within the holding of *SmithKline, infra.*

(2) *Fineman* is factually vastly different from this case.

(3) If *Berkey Photo* does preclude the monopoly leveraging claim here, the Court should ignore it. This court should, for this purpose, consider itself a court of the Federal Circuit, which has not decided the issue in question and, Rolite admits, "in the past has elected, as a matter of discretion, to look to the law of the regional circuit in which a case has been brought to determine the law to be applied to antitrust claims." I should do this, Rolite argues, because "when the patent issues are so completely intertwined with the antitrust claims that have been brought, as here, and where there is an apparent split among the regional circuits, the Federal Circuit, and thus this Court, should apply a uniform rule of law for all patent matters." Thus, I would be "free" to apply *Berkey* instead of *Fineman.*

Defendants reply that Rolite's conclusory allegations of ability to fix and maintain

prices in the Disposal Market fall far short of alleging facts showing that WMX possesses a threatened or actual monopoly in that market: Rolite alleges no facts that WMX has such a monopoly. Defendants also argue that *SmithKline* is distinguishable: they point out that, in fact, in *Fineman* the court stated that the *SmithKline* decision did not implicate the issue with which it was there faced.

■ First, I will quickly discuss and dismiss Rolite's "Federal Circuit law" argument. This Court sits in the Third Circuit, and it therefore is controlled by the legal interpretations of the Supreme Court of the United States and the Third Circuit Court of Appeals. It is telling that Rolite cites no cases that support its novel theory of controlling precedent. Third Circuit law applies, and therefore *Fineman*, not *Berkey Photo*, is controlling.

Second, Defendants are correct as to the distinction between the holdings of *Berkey* and *Fineman*. In *Berkey*, the Second Circuit held that a plaintiff could prevail on a theory of monopoly leveraging by showing that the defendant had gained a "competitive advantage" in the leveraged market through use of his monopoly power in the primary market. *Fineman* explicitly rejected *Berkey*'s holding and held that, in order to prevail upon a monopoly leveraging theory, the plaintiff must prove threatened or actual monopoly in the leveraged market, not mere "competitive advantage." [4]

Therefore, for Rolite's Section 2 claim, insofar as it is based on a monopoly leveraging theory, to survive this dismissal motion, Rolite must have pled facts that, if proven, would demonstrate that Defendants possessed threatened or actual monopoly power in the Disposal Market.

Rolite says that it is has done this, and cites Paragraphs 237, 247–250 of its Amended Complaint. These paragraphs read as follows:

237. By reason of their large aggregate market share, their existing Long Term ARW Disposal Contracts, and Wheelabrator's wrongful attempts to enforce the Patent, among other things, the defendants, acting directly and through various subsidiaries and affiliates, have been able to fix and maintain prices in each of the relevant markets.

247. The defendants' actions have suppressed or reduced competition and threaten to continue to suppress or reduce competition in each of the relevant markets.

248. Rolite has been harmed and injured in its business and property as a result of the defendants' actions by, among other things, loss of profits, loss of good will, increased expenses, and inability to raise capital and enter into joint ventures.

249. Unless enjoined, defendants will continue their unlawful activity.

250. Rolite is threatened with further loss and harm unless the defendants are enjoined from further violations of the antitrust laws.

I agree with Defendants that these paragraphs, and those in the remainder of the Amended Complaint, are insufficient to plead a monopoly leveraging claim. The only pleading Rolite makes with regard to a threatened or actual monopolization of the Disposal Market is that Defendants "have been able to fix and maintain prices in each of the relevant markets," (Paragraph 237) and that "defendants' actions have suppressed or reduced competition and threaten to continue to suppress or reduce competition in each of the relevant markets." (Paragraph 247). These seem to me to be the type of conclusory allegations without any alleged facts to support them that are insufficient even at the pleading stage. *PepsiCo*, at 179.

I also agree with Defendants that *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), is inapposite. Rolite states that the "ability by the Defendants to set prices (i.e., to exercise monopoly

---

4. While *Fineman* was the appellate review of a judgment *non obstante verdicto*, as opposed to a dismissal motion under Rule 12(b)(6) as is before me, *Fineman* set out the elements of the monopoly leveraging claim, and is therefore applicable here, since Rolite must plead all the elements of its claims.

power) in the target market distinguishes this case from *Fineman* and places it squarely within [*SmithKline* ]...." Plaintiff's Response, at 25. Initially, I would point out that it is not clear from its Response what the proposition is for which Rolite cites *SmithKline*, other than that the court there upheld a plaintiff's judgment on a tying claim, which is similar to one of monopoly leveraging.[5] In any event, Rolite relies on the ability of Defendants to set prices/exercise monopoly power in the target market to bring this case within the holding of *SmithKline* for whatever its purpose. However, as discussed, Rolite has made no more than conclusory allegations of monopoly power in the target, i.e. Disposal, market. Furthermore, as Defendants point out, *Fineman* distinguished *SmithKline* with the following statement: "Because the plaintiffs [in *Berkey* ] had proven conduct traditionally proscribed by the Sherman Act, [Berkey did not] implicate[ ] the issue with which we are faced," i.e., whether a showing of "competitive advantage" in the leveraged market is sufficient to make out a monopoly leveraging claim.

Finally, I will note that *Fineman* sets forth the elements of a monopoly leveraging claim in this Circuit, and it is for these elements, which are not factually dependent, that *Fineman* is relevant here. Therefore, Rolite's effort to factually distinguish *Fineman* from the instant case is not persuasive. I will dismiss Rolite's Section 2 claim insofar as it relies on a theory of monopoly leveraging.[6]

### D. Failure to State a *Walker Process* Claim

■ Defendants next move to dismiss Rolite's Section 2 claim insofar is it based upon Wheelabrator's obtainment of its patent through fraud perpetrated on the U.S. Patent and Trademark Office (the "PTO"). Such a claim by Rolite would depend on *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), which held that enforcement of a patent procured by fraud on the Patent Office could serve as the basis of a cause of action under Section 2 if the other elements of a monopolization claim are present.[7]

Defendants contend that *Walker Process* claims bear heavy evidentiary burdens that are rarely met. Therefore, the court should scrutinize this claim carefully now before resources are wasted. Specifically, Rolite must show a very high level of misconduct—actual fraud—and, with regard to materiality, that, "but for" the alleged omission, the patent would not have issued. Defendants argue that Rolite's conclusory allegations at best show inequitable conduct, not actual fraud, and do not adequately demonstrate "but for" causation.

Defendants further contend that Rolite's allegations of fraud are subject to the special pleading requirements of Fed.R.Civ.P. 9(b), which provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity...." Although this language relates to claims of mistake and fraud, Defendants argue, the requirements of the Rule apply to all cases where the gravamen of the claim is fraud, even though the theory supporting the claim is not technically termed fraud. Therefore, they conclude, Rule 9(b)'s stringent pleading requirements apply to Rolite's *Walker Process* claim.

---

5. It should be further noted that there, the patented product and the tied product, both cephalosporin drugs, were held to be part of the same market. Therefore, there was no pair of relevant markets in *SmithKline*, one of which could have been leveraged against the other. The court in that case never termed the claim one of "monopoly leveraging."

6. While the arguments of counsel in their respective briefs focused upon the applicability of *Fineman*, I would point out that Rolite's monopoly leveraging claim may be dismissable on an alternative ground, which was suggested by Defendants: since Rolite does not compete in the allegedly leveraged market, the Disposal Market, it has failed to allege how is has been damaged by Defendants' alleged leveraging. *See AD/SAT, a Division of Skylight, Inc. v. Associated Press*, 920 F.Supp. 1287 (S.D.N.Y.1996).

7. Defendants argument that Rolite has not pled all of the other elements because it has failed to plead relevant product market and possession of monopoly power is addressed in parts III.A. and B. of this opinion, *supra*.

Defendants argue that Rolite's "conclusory" allegations do not meet these requirements. They give the following examples: (1) Rolite fails to identify/describe the activities at the McKay Bay Incinerator that it contends constitute prior art; (2) Rolite fails to identify which steps of claim 13 of the patent are at issue; (3) Rolite fails to allege how . or why any such unidentified use is material to any of the claims of the patent; (4) Rolite fails to allege how the Ash Studies and Technical Report are material to patentability; (5) Rolite fails to identify the unnamed "others" whom it asserts engaged in fraudulent conduct before the PTO.

Rolite responds by arguing that the circumstances of Wheelabrator's fraud, under *Walker Process*, have been adequately pled. It claims that the stringent pleadings requirements of Rule 9(b) do not apply to Rolite's *Walker Process* claim. However, even if Rule 9(b) applies, Rolite contends that it has fully complied with the Rule's requirements. Furthermore, Rolite claims that it has sufficiently alleged "but for" materiality by alleging that the prior art which it claims existed, had it been disclosed to the PTO, would have established the unpatentability of the patent's claims. Rolite concludes that Defendants' argument that the Complaint does not provide enough detail because Rolite does not identify how undisclosed prior art was material to the issuance of the patent goes far beyond the scope of Rule 9(b).

Rolite further responds by arguing that they have another claim here as well which is not dependent upon a showing of fraud in the prosecution of the patent as would be a *Walker Process* claim. Under *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir. 1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 689, 62 L.Ed.2d 659 (1980), an antitrust violation can occur when a patentee attempts in bad faith to enforce a patent, knowing that the patent was invalid, even if lawfully obtained.[8] Thus, at least with regard to its *Handgards* claim, Rolite states that it is not

seeking to allege fraud, but rather wrongful enforcement of an invalid patent, and Rule 9(b) therefore doesn't apply.[9]

In their Reply brief, Defendants maintain that Rolite's *Walker Process* claim is not pled with sufficient particularity. Furthermore, they respond to Rolite's *Handgards* claim by asserting that Rolite has failed to plead a monopolization claim under *Handgards,* because, contrary to Rolite's assertions, upon which its *Handgards* claim depends, a patent does not become invalid if a maintenance fee is not paid on time. 35 U.S.C. § 41(b). Rather, a patentee has the legal right to pay a maintenance fee up to two years late and restore the enforceability of a patent as long as the initial failure to pay the maintenance fee was not intentional. 35 U.S.C. § 41(c)(1).

I will not address the issue of whether Rule 9(b)'s stringent pleading requirements apply here, as I find that Rolite has pled its claims with sufficient particularity even if Rule 9(b)'s requirements are applied.

The Third Circuit addressed the requirements of Rule 9(b) in *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983). There, the Court of Appeals quoted the following passage:

It has been the rule under both common-law and code pleading that allegations of fraud must be made with a great degree of particularity. Thus, it is said that the elements of fraud in an action for false representation are five, as follows: (1) A specific false representation of material facts; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage.

C. Clark, Code Pleading § 48, at 312 (2d ed.1947). The Court then said: "It is the identification of these elements of a fraud claim which the first sentence of Rule 9(b) requires." *Christidis,* at 99.

---

8. Although Defendants did not move to dismiss Rolite's Section 2 claim insofar as it was made under *Handgards,* they do challenge it in their Reply brief, and I therefore will address this here.

9. Rolite points to several paragraphs of the Amended Complaint which they claim show that the *Handgards* violation is nevertheless highly particularized.

Rolite has, in its Complaint, addressed each of the first four elements with particularity. Paragraphs 232 and 233 of the Amended Complaint, setting forth allegations of failure to disclose certain known information to the PTO, allege a "specific false representation of material facts." Paragraphs 197 through 297, and Paragraphs 226 and 227 in particular, allege "knowledge by the person [here, corporation] who made it of its falsity." Those paragraphs, as well as the pleadings in full with regard to this issue, are clear in alleging that Wheelabrator intended that its submissions to the PTO, minus the omissions which Rolite alleges are fraudulent, were to be acted upon by the PTO. And the pleadings in full, and Paragraphs 232 and 233 in particular, make the inescapable implication that the PTO would not have issued the patent had it not been ignorant of the alleged falsity of Wheelabrator's submissions.

As to the fifth element listed by Judge Clark and adopted by the Court of Appeals, that the plaintiff have acted upon the false representation to its damage, I think it is unnecessary that Rolite show this because the claim here is not an actual fraud claim— rather, it is an antitrust claim based upon an allegation of fraud. Thus, as opposed to an actual fraud claim, as contemplated by both Judge Clark and the Third Circuit in *Christidis*, Rolite here is damaged indirectly by the injury to competition which results from the alleged fraud, and not directly because it has "acted upon [the fraud] to [its] damage." Therefore, Rolite need not satisfy the fifth element for its pleading to satisfy Rule 9(b) in this instance.

It is also important to recognize the Court of Appeals' caveats regarding Rule 9(b) in *Christidis:*

> In applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its "particularity" language "is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298, at 407.

*Christidis,* at 99–100.

Rolite points out that it is here claiming a "fraud by omission," and I find this persuasive. A fraud claim based upon the failure to state certain true facts necessarily involves less particularity in pleading than would the pleading of fraud based upon false statements: a plaintiff can plead a particular time, day, and place with regard to the latter, but not the former.

■ Finally, as to Defendants' argument that a patent does not become valid for failure to pay the maintenance fee on time if the patentee pays the fee within two years and the initial failure to pay was not intentional, this argument, at least as summarily argued here, fails to convince me that Rolite's *Handgards* claim should be dismissed, since Rolite has alleged that the initial failure to pay was indeed intentional, thus taking it out of this rule as stated by Defendants.[10]

For the reasons stated above, I will dismiss neither Rolite's *Walker Process* claim nor its *Handgards* claim, as both have been pled with sufficient particularity even if the heightened pleading standard of Rule 9(b) applies.

### E. Failure to Adequately Plead Conspiracy Claims

■ Defendants move for dismissal of Rolite's conspiracy claims (conspiracy to restrain trade under Section 1 and conspiracy to monopolize under Section 2) because they contend that the claims are deficient as a matter

---

**10.** 35 U.S.C. § 41(c)(1) reads, in pertinent part, as follows: "The Commissioner may accept the payment of any maintenance fee required by subsection (b) of this section which is made within twenty-four months after the six month grace period if the delay is shown to the satisfaction of the Commissioner to have been unintentional...." I recognize that this provision is open to the interpretation that, once the Commissioner accepts the maintenance fee, which he did here, the patent is valid. However, since this provision was not a basis of the Defendants' Motion to Dismiss, and since the parties have not had a chance to address this issue, I will not address it at this juncture.

of law.[11] Defendants state that "Rolite has failed to specifically allege *any* facts relating to the conspiracy such as the period of the conspiracy, the object of the conspiracy, and the specific meetings, conversations and actions wherein the alleged conspiracy was formulated and implemented." However, Defendants then fail to cite any cases which would require such a pleading.

Rolite responds that the conspiracy claims are adequately pled as alternative theories of recovery.[12] It states that Defendants statement that there are inadequate allegations of conspiracy are frivolous: "It is difficult to conceive how two companies that have conducted their business 'as a single enterprise, and not as separate, independent and arm's length entities,' especially where one is a subsidiary of the other, could seriously question the conspiracy allegations against them." Plaintiff's Response, at 32. Rolite points to Paragraph 8 and 9 of its Amended Complaint, alleging that Defendants operate as a single enterprise and actively collaborate on bids and contracts, as well as "other allegations of the interactions and joint activities of WESI [i.e. Wheelabrator] and WMX." It claims that Paragraph 147 alone is enough to avoid dismissal, as it is a sufficient factual averment of "actions taken in furtherance of the conspiracy." Paragraph 147 reads:

> On March 25, 1994, the date set for executing the agreed contractual documents between Rolite and Montenay, Rolite was informed by Montenay the WMX and Wheelabrator had informed Montco and Montenay that Rolite's Process infringes Wheelabrator's Patent and the Wheelabrator would sue Montenay if the contractual documents for the Ash Recy-

cling Experimentation Agreement were executed.

Defendants reply that the paragraphs quoted by Rolite in its response "relate to a *single* township and hardly support the purported nationwide conspiracy that has been alleged." Furthermore, Defendants state that the Amended Complaint shows that, despite the alleged interference by Defendants, Rolite succeeded in executing a contract with Montenay, and when its shipments were reduced, those shipments were sent to another company, not Defendants.

▮▮▮ I agree with Rolite's contention, set out in its Response to the Motion, that Paragraph 147 alone is enough to avoid dismissal of either conspiracy count. Rolite there has alleged this fact: both alleged co-conspirators informed Rolite's client of a risk in doing business with Rolite and threatened a law suit. If this factual allegation is proven, from it can be implied (1) an agreement or understanding between the two economic entities; (2) a specific intent to monopolize or restrain trade; and (3) an overt act in furtherance of the conspiracy. Thus, if the factual claim of Paragraph 147 is proven, the elements of a conspiracy would be satisfied. Rolite cites other paragraphs as well, in particular Paragraphs 156–158, which allege acts of one or both WMX and Wheelabrator that would advance the alleged conspiracy.

Defendants cite a 1991 case from this district, *Ajax/Acorn Manufacturing, Inc. v. Berman Sales Co., Inc.*, 1991 WL 224997 (E.D.Pa.), which quotes *Black & Yates v. Mahogany Ass'n*, 129 F.2d 227 (3d Cir.1941), *cert. denied*, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942), in saying: "Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object

---

**11.** While the Supreme Court has held that a parent and a wholly-owned subsidiary cannot be co-conspirators under Section 1 of the Sherman Act due to complete unity of interest, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Court of Appeals of this Circuit has noted that *Copperweld* does not preclude a conspiratorial relationship between a parent and a non-wholly-owned subsidiary. *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482, 1495 n. 20 (3d Cir.1985), *remanded on other grounds*, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986) (corporation could conspire with a 79% owned subsidiary). It

appears from the pleadings and briefs that Wheelabrator may not be wholly owned by WMX.

**12.** That is, they plead that "[t]o the extent the defendants are not regarded as a single enterprise as averred in paragraph 8 [of the Amended Complaint], they consciously and with intent joined, agreed, and conspired together and with others to achieve their anticompetitive purpose and effect." Amended Complaint, Paragraphs 246, 253.

and accomplishment." *Ajax,* at *3. In *Ajax,* the court's dismissal of the Sherman Act claims rested on the fact that, "[w]hile alleged co-conspirators need not be named, they must be identified with a degree of particularity....Plaintiff failed completely to state any facts which would demonstrate the existence of a conspiracy, its object, or accomplishment. No co-conspirators were identified with any specificity." *Id.* The court found no coconspirators because the concerted action alleged was between officers and employees of the same firm, which "does not qualify as conspiracy under § 1 of the Sherman Act." *Id.* Rolite has identified the alleged co-conspirators specifically. Thus, *Ajax* is distinguishable from the present case.

In *Black & Yates,* the Third Circuit went on to say that "[t]he plaintiffs have pleaded none of these facts. Neither the date of the alleged conspiracy nor its attendant circumstances are set forth. Nor is it averred who make [sic] the statements, where, when, or to whom." *Black & Yates,* at 231–32. However, it is not clear from the opinion in that case what the facts were, i.e. what was actually pled. Furthermore, all of this language was dicta in *Black & Yates:* the case was decided on other grounds, and the court preceded the above statements by explicitly saying, "[t]he views just expressed make it unnecessary for us to elaborate upon plaintiff's failure to state a cause of action under the Sherman or Clayton Acts." *Id.,* at 231. In any event, I believe Rolite has satisfied the *Black & Yates* standard: it has alleged the conspiracy (to monopolize or restrain trade), its "object" (to do so by interfering with the contract/attempt to contract between Rolite and client(s)), and "accomplishment" (by warning/threatening client(s) and Rolite).

It is true, as Defendants contend, that Rolite does not allege any conspiratorial statement made between Defendants, or when meetings took place to discuss the alleged conspiracy. However, these are, by their very nature, the kinds of actions that Rolite could not know of, and therefore are what the Supreme Court was speaking of when it said that "summary procedures should be used sparingly in complex antitrust

litigation where ... the proof is largely in the hands of the alleged conspirators...." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The pleadings clearly imply that such statements or discussions took place.

Rolite has alleged sufficient facts to meet its very low pleading burden, and, conversely, Defendants have failed to satisfy the extremely high burden they face in moving for dismissal at the pleading stage. For this reason, I will deny Defendants motion to dismiss Rolite's Section 1 and Section 2 conspiracy claims.

## IV. MOTION TO DISMISS COUNT V: STATUTE OF LIMITATIONS

Finally, Defendants move to dismiss Rolite's state law claims, set forth in Count V of the Amended Complaint, to the extent that they are based upon statements made in July, 1993 and November, 1994, contending that they are time-barred. Rolite claims in Count V that Defendants' alleged conduct constitutes unfair competition, commercial disparagement, defamation, and tortious interference with prospective contractual relations and business advantage.

The claims in question here are state law claims. Therefore, state law will determine the applicable statute of limitations. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The statute of limitations issue raises a choice-of-laws question. As a federal district court adjudicating state law claims, I must apply the choice-of-law rules of Pennsylvania, the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *System Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1136 (3d Cir.1977). The operative choice-of-law rule in Pennsylvania is found in Pennsylvania's "borrowing statute," 42 Pa. C.S.A. § 5521. This statute provides that "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, which-

ever first bars the claim." 42 Pa.C.S.A. § 5521(b).

### A. The July 1993 Statements

 The state law claims are based in part upon statements allegedly made by representatives of Defendants at a bid opening in Camden, New Jersey on July 28, 1993. Both Pennsylvania and New Jersey provide a one-year statute of limitations for claims of defamation. 42 Pa.C.S.A. § 5523(1); N.J.S.A. 2A:14–3. Therefore, under the borrowing statute, a defamation action based upon the July 1993 statements is governed by a one-year statute of limitations, as both New Jersey and Pennsylvania provide. Because the original Complaint was not filed until September 27, 1994, more than a year after the claim accrued, I will dismiss the defamation claim as time barred insofar as it is based upon these statements.

 Defendants contend that the remaining state law claims for commercial disparagement, unfair competition, and tortious interference with prospective contractual relations and business advantage, should be dismissed as well. Defendants claim that the "gravamen" of Count V is defamation, "and the inter-relatedness of all of the claims in Count V is manifested by Rolite's inclusion of them all in a single Count." Defendants' Motion to Dismiss, at 36. They then claim that, "[w]here, as here, the gravamen of an action is one for defamation, Pennsylvania court have repeatedly held that plaintiffs cannot avoid operation of the one-year statute of limitations applicable to defamation claims by the simple expedient of re-labeling the claim as a different tort, such as tortious interference." Defendants' Motion to Dismiss, at 36.

Defendants cite the case of *Evans v. Philadelphia Newspapers, Inc.*, 411 Pa.Super. 244, 601 A.2d 330 (1991), in support of this. In that case, the plaintiff brought an action against a newspaper and its reporters for tortious interference with a contract, defamation, and conspiracy. Defendants argued that, since the tortious interference claim was duplicative of the defamation claim, it was barred by the one-year statute of limitations applicable to defamation claims. The

court stated the issue before it as "whether a tortious interference claim, which is based upon identical allegations set forth in an accompanying defamation claim, should be considered duplicative and, as such, be barred by the one year statute of limitations applicable to defamation claims." *Id.* at 247–48, 601 A.2d at 332. (It also noted that, "in its research, [it] ha[d] been unable to find any authority in [Pennsylvania] which addresses this precise issue." *Id.*)

The court stated that the tort of contractual interference is recognized in Pennsylvania and that the action may be a separate and distinct action from that of libel and slander (i.e.defamation). *Id.* at 248–49, 601 A.2d at 333. It went on to say, however:

> In a situation such as this, however, where the underlying wrong which the complaint alleges is defamation by publication of a libelous report, and the claim of injury set out in each count springs from the act of publication, the Appellants should not be able to circumvent the statute of limitations by merely terming the claim tortious interference when in essence it is one of defamation, subject to a one year limitation of action. In such a situation, we will look to the gravamen of the action, not to the label applied to it by plaintiffs.

*Id.*, at 249, 601 A.2d at 333. Furthermore, the Superior Court found persuasive the "thorough analysis and reasoning" of the trial court, from which it quoted:

> The basic difference between a cause of action for interference with a contractual relationship and a cause of action for defamation resulting in the loss of such a relationship is that the former action can be based on a variety of torts including defamation. Therefore, where the gravamen of an action for interference with a contractual relationship is based on the commission of a tort the statute of limitations for that tort must govern.

*Id.*

The Superior Court concluded that, "since [the plaintiffs'] claim for tortious interference is based upon the alleged false and defamatory character of the communication complained of, and it is indistinguishable from

the claims of libel and slander, the same one year limitation period should apply to both." *Id.* at 252, 601 A.2d at 334–35.

Rolite does not dispute Defendants' interpretation of *Evans,* but rather claims that it does not apply, because "the misrepresentation of [its product] Rolite Aggregate's qualities, as alleged in ... the Complaint, is just plainly not defamatory." Rolite points to Paragraphs 159–161 of the Amended Complaint, which state, in sum, that a statement made by a Wheelabrator employee in an April 13, 1994 letter to Rolite's customers and potential customers "misrepresented the nature, characteristics, and qualities of Rolite Aggregate...." (Paragraph 160). Rolite says that it does not contend that this statement is defamatory, but rather that its constitutes unfair competition.

Rolite attempts to distinguish *Evans* on this basis. It further points out that, unlike Defendants in the case before you, the defendant in *Evans* was a newspaper publisher, not a competitor of the plaintiff. Thus, while the claims in that case were purely for defamation, "here the claims all find their essence in the realm of economic competition. Count V does not stand in a vacuum. It is part of a complaint asserting what are fundamentally issues of unfair competition—by patent misuse (Count I), by monopolization (Count II), by conspiracy in restraint of trade (Count III), and by misrepresentation of the nature and quality of goods (Count IV)." Plaintiff's Response, at 36–37. Rolite further notes with regard to the newspaper/competitor distinction, that, "[w]hile public policy protects the media's news publishing activities by providing a short limitation period, no comparable policy warrants protecting competitors' unfair tactics in the marketplace." Plaintiff's Response, at 37.

Defendants also cite *Hurst v. Beck,* 1992 WL 396592 (E.D.Pa.), as being in accord with *Evans,* without further explanation. In this case a doctor sued a hospital and two physicians for giving references about her that were defamatory and based upon information contained in her confidential personnel file, causing a prospective employer to refuse to hire her. The issue there, as here, was whether the one-year statute of limitations

for defamation applied to the tortious interference claims. The Honorable Herbert J. Hutton interpreted *Evans* as follows:

> In *Evans,* the Pennsylvania Superior Court held that while defamation is a separate and distinct action from tortious interference with a contract, a trial court must first make a threshold determination whether the tortious interference claims existed solely because of the defamatory statements. If the trial court finds that there is no independent basis for the tortious interference claims, absent defamatory statements, the court must apply the one year statute of limitations to both claims for relief.

*Id.,* at \*4 (citations omitted).

The court found "that each of these actions [reading of her personnel file, disclosing her resident scores, relating to the medical center that other physicians did not like to work with her, and the referral to another doctor] arise out of the alleged defamatory statements. While each of the foregoing actions might have had an impact on the plaintiff's business, the 'gravamen' of plaintiff's complaint is that the foregoing conduct was detrimental because of its defamatory character." *Id.,* at \*5.

Rolite attempts to distinguish *Hurst* by once again stressing that in *Hurst,* as in *Evans,* the defendants were not competitors of the plaintiff, so that the "actions did not take place in the competitive marketplace for customers." Plaintiff's Response, at 38.

Finally, Defendants cite *Hanenberg v. Borough of Bath, et al.,* 1994 WL 388279 (E.D.Pa.), also as being in accord with *Evans,* and again without further explanation. In *Hanenberg,* the plaintiff sued, *inter alia,* a newspaper for libel, civil conspiracy, intentional tort, and intentional infliction of emotional distress. The Honorable Ronald L. Buckwalter said that "[t]he media defendants claim this action [for intentional infliction of emotional distress] is time barred using the statute of limitations for the underlying action, which in this case would be defamation as well as the Conspiracy Count VIII. I agree." *Id.,* at \*3. He then cited *Evans.*

However, Judge Buckwalter then went on to say the following:

> The action plaintiff complains the media defendants committed is defamation subject to a one year statute of limitations. However, I need not determine whether the statute of limitations for the underlying complaint bars a cause of action for intentional infliction of emotional distress. Plaintiffs has [sic] not pled sufficient facts for intentional infliction of emotional distress.

*Id.,* at *4.

Rolite attempts to distinguish *Hanenberg,* as it did *Evans,* on the ground that defendants were newspaper publishers[13] and so not competitors of the plaintiff. Furthermore, Rolite notes correctly that Judge Buckwalter's opinion on this issue was mere dicta, as he held, as the quote states above, that he did not have to address the issue of the time bar because insufficient facts had been pled.

When viewed in the light of the entire Amended Complaint, Rolite's state claims are based primarily upon unfair competition rather than on defamation. The injury Rolite claims is not that of a general injury to its reputation, as it would be in a defamation claim, but rather that the statements, both the alleged misrepresentations as to the nature of its product and the statements that Rolite's process infringed upon Defendants' patent, caused customers/potential customers not to deal with Rolite. Perhaps this distinction was better made by the late Chief Judge Alfred Luongo in holding that defamation and commercial disparagement (a.k.a. trade libel) are separate torts: "The action for defamation serves to protect one's interest in character and reputation. The cause of action for disparagement, on the other hand, protects economic interests by providing a remedy to one who suffers pecuniary loss from slurs affecting the marketability of his goods." *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 408 (E.D.Pa.1983). The causes of action for unfair competition and tortious

interference protect interests more similar to those protected by the commercial disparagement cause of action ("economic interests") than those protected by the defamation cause of action ("character and reputation"). Rolite's claims seek to protect its economic interests, not its reputation.

Furthermore, I agree with Rolite in distinguishing the cases which, unlike this case, do not involve a competitor of the plaintiff. I am persuaded by Rolite's argument that the claims in Count V cannot be analyzed "in a vacuum" but rather must be considered in light of the claims, based largely upon the same acts, made in the other counts of the Complaint. Clearly, the gravamen of the Amended Complaint as a whole is unfair competition, not defamation.

## B. The November 1994 Statements

The state claims are also based in part upon statements allegedly made at the Seventh International Conference on Municipal Solid Waste Combustor Ash Utilization on November 15–16, 1994. These claims were first raised in Rolite's Amended Complaint, filed July 10, 1996. At issue with regard to these statements is the effect, as far as the possible tolling of the statute of limitations, of a stay of proceedings entered in November 1994 and in effect until November 1995.

Rolite has made no pleading as to where this Conference occurred, and therefore where this claim accrued. Under Pennsylvania's borrowing statute, I cannot determine which statute of limitations and accompanying law applies without knowing where the claim accrued. Therefore, I will deny without prejudice Defendants' Motion to Dismiss Rolite's defamation claim, with leave to move for summary judgment when a stipulation is submitted or a showing is made as to which statute of limitations applies to these claims.

Furthermore, I will deny Defendants' Motion to Dismiss Rolite's claims of commercial disparagement, unfair competition, and tortious interference with prospective contractual relations and business advantage, insofar

---

13. In their Reply, Defendants note that nowhere in either *Evans* or *Hanenberg* do the courts limit their holding to news media defendants, and assert that the broad applicability of the rule is demonstrated by *Hurst,* which did not involve media defendants. Nor, however, as Rolite notes, did *Hurst* involve competitors as this case does.

as they are based upon the November 1994 statements, for the reason outlined above with regard to the July 1993 statements: I find the gravamen of Count V of the Amended Complaint to be unfair competition, not defamation.

### ORDER

AND NOW, this 25 day of March, 1997, upon consideration of Defendants' Motion to Dismiss Counts II and III and Certain Claims in Count V of the Amended Complaint, and Plaintiff's Response thereto, IT IS ORDERED as follows:

(1) Defendants' Motion to Dismiss Count II is GRANTED insofar as Plaintiff's claim is based upon a monopoly leveraging theory;

(2) Defendants' Motion to Dismiss the remainder of Count II is DENIED;

(3) Defendants' Motion to Dismiss Count III is DENIED;

(4) Defendants' Motion to Dismiss Plaintiff's claim of defamation arising out of statements allegedly made in July 1993 in Count V is GRANTED;

(5) Defendants' Motion to Dismiss Plaintiff's claim of defamation arising out of statements allegedly made in November 1994 in Count V is DENIED WITHOUT PREJUDICE to Defendants' right to raise the issue by motion for summary judgment and/or at trial;[1] and

(6) Defendants' Motion to Dismiss the remaining state claims in Count V is DENIED.

1. Any such motion must address both the substantive issues and the choice of law questions.